614 F.2d 796
 21 Fair Empl.Prac.Cas. 1444,
22 Empl. Prac. Dec. P 30,621
Robert DeGRACE, Plaintiff, Appellant,
v.
Donald RUMSFELD, etc., et al., Defendants, Appellees.
 No. 79-1221.
 United States Court of Appeals,
First Circuit.
 Argued Oct. 2, 1979.
Decided Jan. 30, 1980.
 
 Thayer Fremont-Smith, Boston, Mass., with whom Eric W. Wodlinger, Choate, Hall & Stewart, and Mark S. Brodin, Boston, Mass., were on brief, for plaintiff, appellant.
 Carolyn S. Grace, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for defendants, appellees.
 Before CAMPBELL and BOWNES, Circuit Judges, and BONSAL,* Senior District Judge.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 Plaintiff, formerly employed as a civilian firefighter at the Naval Air Station, South Weymouth (NASSW), brought this asserted class action against the Secretary of Defense and others under 42 U.S.C. § 2000e-16.[1] He complained of racially motivated harassment while so employed and alleged that his discharge was the product of racial discrimination.
 
 
 2
 The district court certified a class consisting of all past, present, and future black civilian employees, applicants, and deterred applicants for civilian employment at NASSW, and the case was tried as a class action. On the second day of this six day trial plaintiff indicated that he did not seek reinstatement but only money damages. After trial was completed but before a decision had been rendered, the district court decertified the class stating plaintiff's interests were not "such as to cause him to fairly and adequately protect the interests of the class." Respecting plaintiff's individual claim, the district court held he was not entitled to damages on account of his discharge, ruling that he was justifiably discharged for excessive absenteeism "without authorization or substantiated excuse" and that the discharge decision "was not influenced . . . by any racial consideration."
 
 
 3
 While thus finding the actual discharge was without bias, the court took a different view of conditions existing within the NASSW fire department during plaintiff's tenure. The department, it found, was "infected with pervasive racism," and NASSW had not satisfied its obligation to correct the offensive conduct of plaintiff's fellow employees which "was or should have been obvious to the supervisory personnel on the base." The court concluded, however, that because 42 U.S.C. § 2000e-5(g) provides only for reinstatement, back pay, and other equitable relief, and because plaintiff was discharged for good cause, he was not entitled to compensatory or punitive damages for whatever humiliation and anguish were sustained as a result of these conditions.
 
 
 4
 Plaintiff now argues the court erred (1) in sustaining the discharge and denying damages therefore, (2) in ruling that as a matter of law plaintiff could not recover compensatory or punitive damages for racism directed at him while he was employed, and (3) in decertifying the class action.
 
 I.
 
 5
 It is not disputed that plaintiff absented himself from work for a very considerable period of time, from November 17, 1974 through January 21, 1975, with the exception of December 21, 1974 when he did report for duty. Nor is it disputed that excessive unauthorized absenteeism would be a proper ground for discharging an employee. Plaintiff argues, however, that his discharge was illegal first because Commander Scarfato was actually motivated by racial animus in discharging him the district court's finding to the contrary being clearly erroneous and second that regardless of Scarfato's actual motives the government violated Title VII by tolerating known discrimination against plaintiff by its own employees discrimination which, under the court's own findings, says plaintiff, prompted the extended absence which led to the discharge.
 
 A.
 
 6
 We review the background leading up to plaintiff's discharge. Plaintiff was first employed at NASSW as a civilian firefighter in June 1971. He was the only black civilian firefighter during his entire time at NASSW.[2] At the end of his probationary year plaintiff was discharged from employment for the stated reason that he had not demonstrated qualifications necessary to promote the efficiency of the service. This discharge, which is not the subject of the instant action, was appealed through Civil Service Commission procedures. The EEO Complaints Examiner found that derogatory racial terms had been used in addressing plaintiff and that the opinions of those who had testified against plaintiff, which included his supervisor, Captain Ostlund, "were coloured by hostility and racial prejudice." The examiner recommended that Captain Ostlund and other supervisory personnel be admonished and given supervisory training on sensitivity in human relations and respect for diverse racial groups and that plaintiff be reinstated.
 
 
 7
 Plaintiff was reinstated in April 1973. While plaintiff was still supervised by Captain Ostlund and Assistant Chief Dowd, another of whom plaintiff had complained, his most immediate supervisor was Captain Mullen into whose platoon he was placed. Captain Mullen had opposed plaintiff's first discharge and seems to have gone out of his way to treat plaintiff fairly. Plaintiff's reinstatement, however, produced some resentment and hostility and the district court so found.
 
 
 8
 Commencing around the beginning of November 1974 and continuing until plaintiff's discharge, certain troubling events occurred: plaintiff discovered some of his equipment damaged, he was given the "silent treatment" by his co-workers, and he received threatening notes.
 
 
 9
 At two different times plaintiff found items of his firefighting gear broken, first his crash helmet and then his survival knife. Although plaintiff believes the equipment was deliberately damaged, the district court disagreed and supportably found to the contrary.
 
 
 10
 Further tension is evidenced by the "silent treatment" accorded plaintiff. Captain Mullen, the supervisor who had opposed plaintiff's first discharge, testified that after an incident in the beginning of November 1974 during which he reprimanded plaintiff and plaintiff responded in an insulting manner, he thereafter spoke to plaintiff only in the line of duty although other firefighters did carry on friendships with plaintiff at that time. By the end of January 1975, however, Mullen was aware that some men felt plaintiff had been telling false tales about them to Commander Scarfato, who had authority over the fire department, and they therefore were not speaking to plaintiff. Plaintiff also described the unfriendly atmosphere and recounted an incident where the crew refused to ride on the vehicle he was driving.
 
 
 11
 Most serious were the three notes plaintiff found in his locker at NASSW between the middle of November and the end of December 1974. Plaintiff discovered the first one, which reads "Hey boy get your Black ass out Before you don't have one," on November 17, 1974 or so. He found the second sometime during the first week of December and the third toward the latter part of December. The second states, "I don't want you sleeping in the same place as me. Your (sic) dirtier and smellier than a mud turtle, so why don't ya just take a hint and get the fuck out you Black niger (sic)," and the third reads "Niger (sic), If we end up having a fire, you'll be staying in it and getting a lot blacker." While there is no direct evidence who wrote the notes, it can be inferred, and the district court so found, that one or more of plaintiff's co-workers was responsible for them.
 
 
 12
 Plaintiff testified that the notes left him apprehensive for his safety. He began to have nervous problems, felt ill, experienced fainting spells, and became afraid to go to work. For these reasons, he says, he did not report for duty calling in sick instead. Plaintiff did not, however, provide any medical certification for his absences either contemporaneously or at any time thereafter, including at trial.
 
 
 13
 Plaintiff, absent since November 19, 1974, did report for duty on December 21, 1974. Commander Scarfato called him to his office and asked for his doctor's note which plaintiff did not have. While plaintiff had, by then, received at least two of the threatening notes, he did not mention them to Commander Scarfato; rather, according to Scarfato, plaintiff stated he was recovered and would be reporting to work from then on. Plaintiff did not again return,[3] however, until January 4, 1975, and it was on that day that plaintiff first informed Scarfato he had been threatened.
 
 
 14
 Plaintiff testified that he showed photostatic copies of the notes to Scarfato on January 4, 1975 and told him the reason he had been absent was because he "was kind of afraid of the situation that might come up . . . where you need team work in a firefighting situation, and (he) was kind of doubtful whether (he) could have it or not." Upon reading the notes, Scarfato expressed his willingness to call in the Naval Investigating Service (NIS), but, according to Scarfato, plaintiff said he did not want to make a big issue over the notes since he still had to work with the men. Nonetheless, Scarfato informed the base commanding officer of the threatening notes who, as the district court found, ordered an investigation by NIS.
 
 
 15
 Plaintiff next met with Scarfato and also with Mr. Stevens, the civilian personnel officer, on January 8 or 9, 1975. Plaintiff was then informed that a reassignment, as he had requested on January 4, 1975, was not possible because there were no openings for which he was qualified. Stevens testified that plaintiff was questioned whether his continued absence was still due to illness and plaintiff indicated his primary reason for his current absence was concern over the notes, but, plaintiff added, his fear was not sufficient to prevent his return to duty on his next scheduled tour January 10, 1975. Plaintiff did not return, however, until January 22, 1975.
 
 
 16
 The NIS investigation was also discussed at the January 8 or 9 meeting, and, according to Stevens, plaintiff was at first noncommittal but concluded by stating he did not want the investigation conducted. Plaintiff subsequently did meet with a naval investigator on January 22, 1975 and again on January 24, 1975. The investigator testified that while plaintiff was, on January 22, 1975, interested in proceeding, by January 24, 1975 he had changed his mind stating his attorney had advised him not to cooperate with the investigation and not to surrender the originals of the notes which were needed for handwriting analysis. The investigator asked plaintiff if he was afraid for his life and plaintiff responded no. The investigation was cancelled at plaintiff's request.
 
 
 17
 By letter dated December 6, 1974 plaintiff had been informed that he had exhausted all his available annual and sick leave, and he was advised of the steps to take to obtain a continued authorized leave status and the consequences which might follow for failure to do so. The letter stated in part
 
 
 18
 "Failure to request and gain approval of either advance sick leave or continued leave without pay will result in your placement in an absence without leave (AWOL) status. Every attempt should be made to avoid such action since employees who are AWOL are subject to disciplinary action. It is therefore urged that you initiate a request for either advanced sick leave or continued leave without pay as soon as possible. This request must be in writing and routed to the Commanding Officer via my office. . . . Your request for either category must be accompanied by a justification. Since your reason for absence apparently is illness and you have not reported for duty for a considerable time, your request should be accompanied by a physician's certification. This request should be initiated as soon as possible and no later than 13 December 1974."
 
 
 19
 Plaintiff never did submit a written request or, according to NASSW, articulate a justification for his continued absence. Consequently, by letter dated February 7, 1975, plaintiff was notified of NASSW's proposal to remove him as a penalty for excessive unauthorized absenteeism. The reasons for the action were stated as follows:
 
 
 20
 "b. From 17 November through 26 December 1974 you had been properly notifying your supervisors that your absence was caused by illness and, based upon that information, your supervisors' entries on timecard and attendance records were either sick leave or leave without pay. . . . These timecard and attendance record entries for sick leave and leave without pay were made on a tentative basis pending receipt of acceptable medical certifications as required by reference (a) (reference (a) apparently enclosed with the notice of proposed removal, was Naval Air Station South Weymouth Instruction 12630.1E).
 
 
 21
 "c. Beginning with your scheduled tour of duty commencing 27 December 1974 you failed to properly notify your supervisors of your reason for absence and, accordingly, you were charged absence without leave (AWOL) and disciplined in the form of three workdays suspension. . . .
 
 
 22
 "d. Continuing beyond 31 December 1974 and leading up to your return to duty on 22 January 1975 you complained about physical ailments but never provided a clear indication of your reason for absence despite being questioned in this regard. Your supervisors therefore were advised to make AWOL entries on your timecard and attendance records for absences during that period with the possibility of modification to the entries based upon receipt of proof of reasonable cause for absence such as, for example, your furnishing acceptable medical certification.
 
 
 23
 "e. . . . Sick leave requests and medical certificates (must) be produced upon return to work status or no later than 15 days from date of return. Since you returned to a full work status on 22 January 1975, you were required to submit a sick leave request supported by medical certificates no later than 6 February 1975. Your failure to comply with this requirement has now become cause for identifying all of your absenteeism during the period of 17 November 1974 through 19 January 1975 as unauthorized absence in the category of absence without leave."
 
 B.
 
 24
 The district court made the following findings regarding the events leading up to the discharge. The court stated that plaintiff, "at least until 1974 performed well in (the) capacity" of a firefighter. In 1974, however, plaintiff's attitude toward work deteriorated, "manifested among other ways in serious tardiness, failure to report for duty as assigned, and disrespectful language to his superior officers." Commenting that these failings "may partially explain the hostility of plaintiff's fellow workers," the court also found that plaintiff's co-workers "regularly engaged in racially discriminatory conduct towards plaintiff, unrelated to plaintiff's misconduct":
 
 
 25
 "I find there was general resentment at his reinstatement and that plaintiff was subjected to racial epithets and slurs. (There is some evidence that he returned some of the same, but that does not alter the case.)"
 
 
 26
 After describing the three threatening notes plaintiff had received and expressly inferring they had been written by fellow firefighters, the court addressed an issue central to this appeal plaintiff's motivation in being absent from work:
 
 
 27
 "After finding the first note plaintiff did not report for work from November 19, 1974 until December 21. I find that at least part of the reason for his absence was fear for his personal safety. On December 21 he reported for work and stated that he would report for work thereafter. He did not report for work on the following day or again until January 4, 1975." (Emphasis added.)
 
 The court then continued:
 
 28
 "During all this time (meaning, it would seem, November 19-January 4) plaintiff reported that he was absent because of physical illness. There was no medical substantiation provided for these absences, either to plaintiff's superior officer when requested in January 1975 or at trial. I do not believe the testimony of the plaintiff or of his family that he suffered physical symptoms because of the fear engendered by the three threatening notes.
 
 
 29
 "Plaintiff first notified his superiors at NASSW of the threatening notes on January 4, 1975. The Commanding Officer immediately ordered an investigation by a naval intelligence officer. The investigation was terminated at the plaintiff's request. The plaintiff claims that he did so because Fire Captain Mosher had suggested that the matter be settled within the fire department. I find that no duress or undue influence was brought to bear on the plaintiff to force him to cancel the investigation. If the suggestion was in fact made as described by the plaintiff, it was clearly no more than a suggestion which the plaintiff was free to disregard."
 
 
 30
 The court noted that plaintiff again failed to report to work from January 9 until January 22.
 
 
 31
 After making the foregoing findings, the court rendered its ultimate conclusions, first on the issue of the discharge, and second on the racism at the NASSW fire department. Plaintiff argues these two sets of findings are inconsistent and that the latter undermines the former. As to the discharge the court said:
 
 
 32
 "I further find that Commander Scarfato, the naval operations officer responsible for the fire department, considered that the fire department was understaffed and that any further reduction in force would jeopardize the safety of both fliers and firefighters. I find that he was warranted in concluding that plaintiff's absence without authorization or substantiated excuse was grounds for dismissal. I find that he was not influenced in that decision by any racial consideration. Accordingly, I find that plaintiff is not entitled to damages on account of his discharge."
 
 
 33
 As for the racial climate at the fire department, the court stated:
 
 
 34
 "I find that the fire department at NASSW was infected with pervasive racism. The offensive conduct of plaintiff's fellow employees was or should have been obvious to the supervisory personnel on the base, and they were under an obligation to take affirmative action to correct it. This obligation was not satisfied by the sporadic 'pep talks' revealed by the evidence."
 
 C.
 
 35
 The central issue in this appeal is the possible relationship between plaintiff's alleged fear, attributed to racially motivated harassment by his fellow workers, and the prolonged absence from work for which he was fired. In essence plaintiff's argument is as follows. Plaintiff's fear, the product of the pervasive racism at NASSW for which, as the district court found, defendants are responsible must be held to constitute a "substantiated excuse" for his absences. Even if Commander Scarfato's own motive was pure, this cannot insulate defendants from their failure to correct the racially offensive conduct which produced plaintiff's absences.
 
 
 36
 Plaintiff's argument has some force. While Commander Scarfato himself may well have been moved simply by the obvious need of the fire department to have personnel who were available and reliable, defendants would ordinarily be chargeable not only for Scarfato's conduct and motives but for those of the other supervisory personnel whose action or inaction bore on plaintiff's discharge.[4] See Miller v. Bank of America, 600 F.2d 211 (9th Cir. 1979); Barnes v. Costle, 561 F.2d 983, 993 (D.C. Cir. 1977); Anderson v. Methodist Evangelical Hospital, Inc., 464 F.2d 723 (6th Cir. 1972). An employer may not stand by and allow an employee to be subjected to a course of racial harassment by co-workers, and thus defendants must accept responsibility for their supervisors' derelictions, if such existed, in responding to the racial problem at NASSW. See Firefighters Institute for Racial Equality v. City of St. Louis, 549 F.2d 506 (8th Cir.), cert. denied, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977) (city may not allow on duty firefighters using city cooking facilities to exclude blacks from informal "supper club" eating arrangements); Croker v. Boeing Co., 437 F.Supp. 1138, 1193-94 (E.D.Pa.1977); Bell v. St. Regis Paper Co., 425 F.Supp. 1126, 1137 (N.D.Ohio 1976) (employer may be legally responsible for employees' harassment of other employees merely by condoning such conduct); Friend v. Leidinger, 588 F.2d 61, 67-69 (4th Cir. 1978) (Butzner, J., dissenting); B. Schlei & P. Grossman, Employment Discrimination Law 236-38 (1976). If because of the culpable neglect of supervisory personnel plaintiff was put in reasonable fear for his personal safety and if "but for" the fear thus engendered plaintiff would not have absented himself, we do not think Commander Scarfato could properly discharge plaintiff for unauthorized absence. If, however, after all reasonable measures had been taken to correct the situation plaintiff then unreasonably refused to return to work, we think he was subject to discharge. Thus, for plaintiff to prevail on the theory that defendants violated Title VII by discharging him for absenteeism stemming from the offensive conduct of his fellow employees, we think plaintiff had to establish
 
 
 37
 1. that he was reasonably placed in fear for his personal safety as a result of the racially motivated misconduct of his fellow employees;
 
 
 38
 2. that after NASSW was aware or should have been aware of the misconduct and plaintiff's reasonably based fear it failed to take reasonably feasible measures to deal with the situation;
 
 
 39
 3. that but for his reasonably based fear and his supervisors culpable failure to take corrective action plaintiff would have reported for duty;
 
 
 40
 4. that plaintiff, himself, acted in a manner reasonable under the circumstances.
 
 
 41
 It is unclear whether the district court analyzed matters in this way. The district court may have proceeded on the assumption that the absence of racial bias on Scarfato's part necessitated a denial of all relief stemming from the discharge. Further inquiry, however, was required. Section 2000e-16(a) of Title 42 provides that "(a)ll personnel actions . . . shall be made free from any discrimination based on race . . . ." A discharge because of an absenteeism motivated by racial harassment from plaintiff's fellow workers and his supervisors' failure to take reasonable measures to prevent or correct the same, cannot be said to be "free from any discrimination based on race" even if the ultimate decision maker was moved purely by a legitimate concern for having personnel ready and willing to perform their duties. Because we think the district court may not have applied the correct standard and because no findings were made on some of the critical points outlined above, we vacate its judgment and remand for further findings consistent with this opinion. We discuss the four factors set forth above with a view to pointing out some of the areas where further clarification is needed.
 
 
 42
 1. Whether plaintiff experienced a reasonably based fear for his personal safety as a result of the racially motivated misconduct of his fellow employees.
 
 
 43
 We think that the district court's findings are generally adequate on this point. The court found that the threatening notes were written by one or more of plaintiff's fellow firefighters and that at least part of the reason for plaintiff's absence was fear for his personal safety. Implicit is the finding that the fear stems from the notes since there is no other reason for plaintiff's apprehension. While the court does not explicitly state that plaintiff's fear was reasonable under the circumstances, we do not understand defendants to contend that fear would be an unreasonable, aberrational response to notes of such a tenor especially in light of firefighters' occupational situation where mutual dependency and cooperation is required for safe firefighting.
 
 
 44
 2. Whether, after NASSW was aware or should have been aware of the misconduct and plaintiff's reasonably based fear, it failed to take appropriate measures to deal with the situation.
 
 
 45
 Defendants do not dispute the proposition that condonation by NASSW supervisory personnel of a pattern of racially discriminatory conduct by plaintiff's fellow employees would constitute a violation of Title VII. Defendants do contend, however, that NASSW responded promptly and forcefully to every instance of offensive conduct of which it was aware and did all that could reasonably be expected to combat the racism of its employees.
 
 
 46
 We agree with defendants that an employer who has taken reasonable steps under the circumstances to correct and/or prevent racial harassment by its nonsupervisory personnel has not violated Title VII. See, e. g., Higgins v. Gates Rubber Co., 578 F.2d 281 (10th Cir. 1978); Bell v. St. Regis Paper Co., Container Division, 425 F.Supp. 1126 (N.D.Ohio 1976); Howard v. National Cash Register Co., 388 F.Supp. 603 (S.D.Ohio 1975); Fekete v. United States Steel Co., 353 F.Supp. 1177 (W.D.Pa.1973), where, upon findings that the employer did not condone employee misconduct but rather acted to prevent it, the employer was not held liable under Title VII. It may not always be within an employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy. To what lengths an employer must go we do not venture to say. The seriousness of the harm posed by the conduct will be a factor. But once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with discriminating on the basis of race.
 
 
 47
 Here, NASSW's alleged derelictions occurred in two stages: its tolerance of the racially hostile climate which culminated in the threatening notes and its response to the notes themselves. With respect to the first, the district court found NASSW's obligation had not been met: sporadic pep talks were not enough.[5] While NASSW's actions in the first instance are not irrelevant, it is the second stage which is of primary importance here. The district court did not determine whether NASSW, once informed of the notes, acted in a reasonable effort to identify the transgressor(s) and to protect plaintiff or whether it failed to take reasonable steps necessary to deal with the threats plaintiff had received. To be sure, plaintiff opposed the NIS investigation. Other means, however, such as an intradepartmental investigation, which plaintiff claims he favored, should perhaps have been pursued.
 
 
 48
 3. The reason for plaintiff's absences.
 
 
 49
 The district court's findings are ambiguous in critical respects on plaintiff's reason for failing to report to work.[6] The district court's recounting of plaintiff's absence from November 17, 1974 to December 21, 1974 was followed by its finding that "at least part of the reason for his absence was fear for his personal safety." (Emphasis added.) This is not equivalent to a finding on the pivotal question whether "but for" the fear plaintiff experienced he would have reported to work. Compare Givhan v. Western Line Consolidated School District, 439 U.S. 410, 417, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Loeb v. Textron, Inc., 600 F.2d 1003, 1019 (1st Cir. 1979). For plaintiff to prevail, fear would have to be a determinative factor, not merely a reason which reinforces plaintiff's decision on another, non-legitimate, ground to stay away but which, by itself, is not operative. A proper excuse such as fear for personal safety, reasonably based, must not only be available to plaintiff but plaintiff must actually be acting on this ground before he can claim his absence was justified. Thus, for example, were an employee entitled to take time off to attend a relative's funeral his absence would not be justified if he instead used the day to go to an amusement park.
 
 
 50
 A further difficulty is that we cannot tell whether the court's finding with respect to the fear plaintiff did experience pertains to the entire length of plaintiff's absence or only to the period November 19, 1974 to December 21, 1974. The context of the finding could suggest the latter, and such a finding would not be without support in the record according to Scarfato, plaintiff did state on December 21, 1974 that he would be reporting for duty thereafter. Plaintiff may have found the third note after his talk with Scarfato, however, and in that event it is unlikely his fear was extinguished as of December 21, 1974. We think the court's ambiguous findings as to the reason for plaintiff's absences need to be clarified. If, as the plaintiff is reported to have stated on January 4, 1975, he was not afraid to return to work yet he failed for an improper or unsubstantiated reason to report for duty then plaintiff could properly be discharged.
 
 
 51
 4. Whether plaintiff acted reasonably under the circumstances.
 
 
 52
 Even though plaintiff has been, as the district court found, the victim of racial discrimination at NASSW, and had suffered abuse during his tenure from both his supervisors and fellow workers, his subsequent conduct including his absences was not thereby necessarily justified. Not every response by the victim of racial discrimination can be excused; actions may be so outside the parameters of reasonable conduct that they cannot be tolerated. See Higgins v. Gates Rubber Co., 578 F.2d 281 (10th Cir. 1978) (victim of racial harassment who responded by striking offending employee with metal bar was properly discharged for assault with a deadly weapon). While due allowance must be made for plaintiff's fear and hostility, he too had to act reasonably to bring matters to NASSW's attention, to communicate his position, and to cooperate with or at least not impede NASSW's good faith efforts to correct the situation.
 
 
 53
 First, we think that absent good reason for not doing so, plaintiff was required to communicate to NASSW in a timely fashion the real reason for his absence.[7] NASSW, in discharging plaintiff, was operating under the impression, or at least the base so maintains, that plaintiff was claiming his physical illness prevented his return to work. Plaintiff was informed several times of the procedure for obtaining an authorized leave but did not comply. When plaintiff failed to supply medical verification for his absence, NASSW discharged him in accordance with personnel regulations. Plaintiff, on the contrary, contends he told Scarfato on January 4, 1975 that his real reason was fear, not illness. Hence, in plaintiff's view, NASSW's continued insistence upon medical certification after being informed plaintiff had not been sick only highlights a racially motivated animus towards him. Whether the base knew or should have known that fear, not illness, was the real reason for plaintiff's long absence is, on this controverted record, for the district court to determine. We do not think that an employee who, only after adverse action has been taken, comes forward with a reason which, if offered earlier, would have excused the conduct for which he was fired, is entitled to prevail in a Title VII action unless his earlier reticence is justified.[8] Otherwise, needless disruption is occasioned.
 
 
 54
 Second, plaintiff cannot have it both ways. He cannot unreasonably block NASSW's actions and maintain his right to stay away from the base. We do not say that he necessarily had to accede to the NIS investigation. Through discussion, NASSW and plaintiff may have been able to reach a mutually agreeable alternate course. But plaintiff could not stand mute, refusing to report to work and not making his reason for opposing NASSW's proposed conduct known. Whether plaintiff's course of conduct was reasonable under the circumstances is for the district court to determine.
 
 
 55
 We think further consideration along the lines outlined above is required. We do not contemplate that the court will need to reopen the case to take additional evidence. We expect the court will be able to make the needed findings on the basis of the present record after, perhaps, hearing further arguments or receiving additional briefs from the parties.
 
 
 56
 We deal briefly with plaintiff's remaining contentions concerning his discharge. Plaintiff maintains that Scarfato himself was influenced by racial considerations in discharging him, and plaintiff points in support thereof to evidence that Scarfato took a "very personal interest" in plaintiff's whereabouts. The district court's finding that Scarfato's decision was free from racial bias is not clearly erroneous.[9] Scarfato's interest in plaintiff is explained by the manpower shortage at NASSW which plaintiff's tardiness and absenteeism exacerbated.
 
 
 57
 Nor do we find merit in plaintiff's point that because the personnel regulations under which he was discharged neither specify the precise point at which an unauthorized absence is deemed excessive nor prescribe which among several penalties must be accorded,[10] he was somehow discriminated against. It would be an open scandal if absences such as plaintiff's, unexplained, were to be condoned by a government agency.
 
 
 58
 Nor is plaintiff's claim that he was treated more harshly than a similarly situated white firefighter substantiated by the record. The fragmentary evidence to which plaintiff points provides no support for plaintiff's assertion that the white firefighter's attendance record was equivalent to plaintiff's. Captain Mullen, who had issued a letter of caution to plaintiff on October 22, 1974 reprimanding plaintiff for failing to notify the firehouse of his absence that day, was questioned whether he had ever issued any other such letters. He replied that he had given a white firefighter who had run out of leave and failed to report an almost identical letter. Neither the subsequent fate of the white firefighter nor his number of absences was disclosed and thus there is no basis for concluding plaintiff and he were similarly situated yet received disparate punishments.
 
 II.
 
 59
 Plaintiff next argues he is entitled to an award of compensatory and punitive damages for the mental anguish he suffered as a result of the officially condoned racism directed against him.
 
 
 60
 The enforcement provision of Title VII, 42 U.S.C. § 2000e-5(g), authorizes the court, upon a finding that a defendant "has intentionally engaged in . . . an unlawful employment practice charged in the complaint," to enjoin the defendant and to order "such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate." All of the circuits which have addressed the matter have concluded that 42 U.S.C. § 2000e-5(g) does not authorize an award of either punitive or compensatory damages of the nature plaintiff seeks. Harrington v. Vandalia-Butler Board of Education, 585 F.2d 192 (6th Cir. 1978), cert. denied, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979) (compensatory damages not permitted under Title VII); Richerson v. Jones, 551 F.2d 918, 926 (3d Cir. 1977) (punitive damages not authorized); Pearson v. Western Electric Co., 542 F.2d 1150, 1151-52 (10th Cir. 1976) (neither compensatory nor punitive damages available under Title VII); Equal Employment Opportunity Commission v. Detroit Edison Co., 515 F.2d 301, 308-10 (6th Cir. 1975), vacated on other grounds, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977) (punitive damages not authorized by 42 U.S.C. § 2000e-5(g)); see also Russell v. American Tobacco Co., 528 F.2d 357, 366 (4th Cir. 1975), cert. denied, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976) (punitive damages not authorized (dicta)). Claiborne v. Illinois Central RR, 583 F.2d 143 (5th Cir. 1978), cert. denied, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979), which plaintiff cites, is not to the contrary. There, while specifically declining to decide whether an award of punitive damages under Title VII is proper, the court permitted the award to stand under the 42 U.S.C. § 1981 count. Here, plaintiff's action arises only under Title VII, which provides the exclusive remedy for claims of discrimination in federal employment, Brown v. General Services Administration, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), and thus we conclude plaintiff is not entitled to either compensatory or punitive damages for the mental anguish suffered.
 
 III.
 
 61
 Plaintiff's third contention is that the district court erred in decertifying the class. Initially, the court certified, under Fed.R.Civ.P. 23(b)(2),[11] a class consisting of all past, present, and future black civilian employees, applicants, and deterred applicants for civilian employment at NASSW. On the second day of trial plaintiff stated he preferred to retain his present position as a firefighter in the Brockton Fire Department than to return to NASSW, and his counsel then made clear that reinstatement was not in issue. Subsequent to completion of trial but before a decision on the merits issued, the court decertified the class stating:
 
 
 62
 "Upon review of the evidence proffered on the merits in this case, I am of the opinion that class certification was improvidently granted. The plaintiff not only had been hired at the defendants' facility but having been fired, made clear at the trial that he did not choose to be reinstated, but was interested solely in money damages. He prefers his present job. Accordingly, he is not a proper party to fairly represent a class who purportedly seeks redress for discriminatory hiring practices because his claim is not typical of the claim of the class who are described as seeking employment at the defendants' facility. By the same token his interest was not such as to cause him to fairly and adequately protect the interests of the class."
 
 
 63
 Plaintiff's arguments center on two alleged errors in the decertification order: the conclusions that (1) because plaintiff was not discriminated against in the hiring process he may not represent a class of applicants or deterred applicants alleging discrimination in that process and (2) that a terminated employee who does not seek reinstatement may not represent the interests of present employees and/or applicants for employment.
 
 
 64
 We think few fast rules concerning whether an employee or former employee is a proper representative, under Fed.R.Civ.P. 23, of non-employees can be formulated; the particular circumstances of each case will be important. Citing, inter alia, Young v. Edgcomb Steel Co., 363 F.Supp. 961 (M.D.N.C.1973), modified, 499 F.2d 97 (4th Cir. 1974), we recognized that courts have permitted employees to represent applicants. Jackson v. Dukakis, 526 F.2d 64, 67 (1st Cir. 1975). Such representation may be proper when, as in Edgcomb, the challenged hiring procedures are closely akin to the very transfer or promotion procedure about which the named plaintiff-employee complains. In Edgcomb, one of the allegedly discriminatory practices was the use of the Wonderlic Personnel Test employed in reaching both hiring and transfer decisions. As the named plaintiff, a current employee, had suffered the same type of discrimination as would job applicants being judged on the basis of an unvalidated test his claims were typical of the class claims and hence it was likely (assuming competent counsel had been retained) that he would adequately represent the class interest. Where this community of interest does not exist, employees have been barred from representing applicants for employment. Hill v. Western Electric Co., 596 F.2d 99 (4th Cir. 1979); Chavez v. Tempe Union High School District # 213, 565 F.2d 1087, 1094 n.10 (9th Cir. 1977).
 
 
 65
 The district court did not abuse its discretion in concluding plaintiff was not a proper party to represent a class seeking redress for discriminatory hiring practices.[12] Plaintiff did not claim he had been discriminated against in that process, nor did his individual grievance termination implicate hiring procedures. If there are circumstances under which a current employee or former employee seeking reinstatement has a sufficient personal interest in the elimination of hiring barriers to enable him properly to function as a class representative, they are not present here.[13]
 
 
 66
 Nor do we find any abuse of discretion in the second challenged conclusion. We think the type of relief the named plaintiff requests on his own behalf may well reflect upon the determination whether he is a proper class representative. The former employee who seeks reinstatement on his individual claim and elimination of a challenged employment practice on the class claim is likely to have a personal stake in the relief accorded the class unless the practice is eliminated he too will again be subjected to the alleged abuse upon reinstatement. This circumstance accords a congruence of interest between the class and individual claims, and the named representative's self interest is advanced by a vigorous pursuit of the class claims. The terminated employee who seeks only back pay may be in a different position. He may have no greater an interest in ameliorating employment conditions than that of any other non-employee.
 
 
 67
 We do not mean to imply, however, that a terminated employee who requests only back pay, not reinstatement, may never represent a class of past, future, or present employees. Circumstances may render such representation proper under Fed.R.Civ.P. 23. Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239, 250-51 (3rd Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), is illustrative.
 
 
 68
 There, plaintiffs, former female employees of defendant company, challenged the discriminatory treatment accorded female technical employees in defendant's claims department. The position of claims representative in that department was staffed predominantly by females while males for the most part filled the position of claims adjusters. Although the qualifications for and basic functions performed by employees of both positions were similar, the salary and promotion opportunities for the predominantly male adjusters were significantly more favorable. Although the named plaintiffs apparently did not seek reinstatement, they were permitted to represent a class consisting of all present and future female technical employees in defendant's claim department. Id. at 244. The court specifically rejected defendant's argument that the named plaintiffs, who presumedly sought only monetary relief on their own behalf, were not adequate representatives of the members of the certified class stating:
 
 
 69
 "We believe that a former employee, who is not entitled to reinstatement, may still be an adequate representative of a class of past and present employees alleging discriminatory employment practices. (Footnote omitted.) Whether a party adequately represents a class depends on all the circumstances of the particular case. . . . That a person is no longer employed with a company and is not entitled to reinstatement is but one of the circumstances to be considered . . . ."
 
 
 70
 Id., 247.
 
 
 71
 To be sure, the plaintiffs in Wetzel, apparently uninterested in returning to the claims department, had no more of a personal stake in the elimination of the discriminatory employment practice than does the plaintiff herein. However, there is an important difference between the two cases. Establishment of the Wetzel plaintiffs' individual claims was likely to implicate the legality of defendant's entire job classification scheme in the claims department, thereby affecting other female technical employees. Class claims were apt to be advanced in the process of litigating the individual claims. See Lamphere v. Brown University, 553 F.2d 714, 719 (1st Cir. 1977) (noting class aspects of even individual Title VII actions). When the named representative's own claim transcends the individual and implicates a discrete employment practice, the commonality and typicality requirements of Fed.R.Civ.P. 23(a) may be satisfied and class treatment may be appropriate.
 
 
 72
 Establishment of plaintiff's entitlement to back pay here does not have the same class implications. Defendants maintain plaintiff was properly discharged for excessive absenteeism and failure to substantiate the same. Plaintiff does not, in contrast to the Wetzel plaintiffs, challenge a broad employment practice; he does not claim that a practice of discharging employees guilty of excessive and unsubstantiated absenteeism violates Title VII. His claim is more individualized that his absence was justified.[14]
 
 
 73
 While plaintiff relies heavily on Wetzel we do not think it supports his argument that he is the appropriate party to redress, on behalf of the formerly certified class, those allegedly discriminatory practices identified in his complaint deficiencies in hiring and promotion procedures. We have already dealt with hiring. Plaintiff fares no better with respect to promotion. Plaintiff did, by way of background, allege in his complaint that he had been denied a promotion to GS level 5 but it became clear at trial that plaintiff subsequently achieved this level and was not seeking any redress in that regard. Because plaintiff has no interest in reinstatement, plaintiff will not again be subjected to defendants' allegedly discriminatory promotion practices.[15] We conclude the district court did not abuse its discretion in concluding certification had been improvidently granted and therefore in decertifying the class.[16]
 
 
 74
 The order of the district court decertifying the class action is affirmed; the judgment for defendants is vacated and the case remanded for further proceedings consistent with this opinion.
 
 
 75
 So ordered.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 Section 2000e-16(a) reads, in pertinent part, "All personnel actions affecting employees . . . (in various branches of federal service) shall be made free from any discrimination based on race, color, religion, sex, or national origin."
 
 
 [2]
 There were several black military firefighters at the base during the earlier years of plaintiff's employment but they left as the military contingent was phased out. At the time of plaintiff's final discharge, the department numbered approximately 40 civilian firefighters. Subsequent to plaintiff's discharge a black civilian firefighter was hired
 
 
 [3]
 Plaintiff may have received the third note on December 21, 1974 after his conversation with Scarfato
 
 
 [4]
 To put the matter more starkly, can it be doubted that had defendants' supervisors actually condoned or encouraged threats by members of the fire department to kill plaintiff if he came to work, plaintiff's absence would not be grounds for discharge?
 
 
 [5]
 The racial climate at NASSW was far from hospitable. Given the discrimination found in plaintiff's first discharge and the resentment of plaintiff's fellow employees to his reinstatement, strong measures were perhaps required if plaintiff's assimilation back into the NASSW fire department was to be achieved. Against this background, it could be found that more than mere verbal chastisements of those employees who used racial epithets was needed in order for NASSW forcefully to convey the message that racism would not be tolerated. Compare the employer's response in Howard v. National Cash Register Co., 388 F.Supp. 603, 605 (S.D.Ohio 1975) (employee who used the word "nigger" was suspended for three days). NASSW's initial failings may have paved the way for the intensification of hostile relations which culminated with the threatening notes
 
 
 [6]
 Plaintiff has, at different points in time, alternatively advanced two different reasons for his absences illness and fear. Both reasons were propounded up to and during the administrative proceedings stemming from plaintiff's discharge. In his letter to the Chief Appeals Officer of the Federal Employee Appeals Authority plaintiff's attorney (not his present counsel) stated:
 "The grounds for (plaintiff's) appeal are as follows: He has substantial justification for the time he missed from work as he was under medical care because of an enlarged liver and an infection in his right ear which were treated at the South Shore Hospital in Weymouth. He was under medical care for pleurisy of his left lung which was treated at the Cardinal Cushing Hospital in Brockton, and he was also being cared for by his private physician in Brockton. Mr. DeGrace was also treated at the Naval Air Station dispensary.
 "It should also be noted that Mr. DeGrace alleges that racial discrimination is involved in his termination and states that notes containing racial epithets were left on his bed and in his locker at the Naval Air Station."
 It was not until the district court proceeding that plaintiff's emphasis shifted away from physical illness to fear.
 
 
 [7]
 We are not here deciding whether or not an employee must exhaust an employer's internal procedures designed to obtain redress for adverse personnel actions. See Miller v. Bank of America, 600 F.2d 211, 214 (9th Cir. 1979) (exhaustion of company remedies is not a prerequisite to a Title VII action). That is a different question. We merely state that an employee who keeps his employer in the dark as to the reason for said employee's apparent misconduct may not, ordinarily, complain when he is fired for that conduct
 
 
 [8]
 Compare, e. g., United States v. City of Buffalo, 457 F.Supp. 612, 632-35 (W.D.N.Y.1978) (unlikely that employee complaints would have been redressed if made known to employer); Friend v. Leidinger, 588 F.2d 61, 68 (4th Cir. 1978) (dissenting opinion's description of the futility of bringing complaints to employer's attention)
 
 
 [9]
 In discrimination cases particular reliance is due to the perceptions of the district judge who hears the evidence, sees the witnesses, and is best situated to make the close judgments often required. We apply the clearly erroneous standard to his findings of fact. Sweeney v. Board of Trustees of Keene State College, 604 F.2d 106, 109 n.2 (1st Cir.), petition for cert. filed, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1979)
 
 
 [10]
 The notice of proposed removal stated: "Unauthorized absenteeism is normally cause for some kind of disciplinary action which typically can range from a letter or reprimand to removal, depending upon the magnitude of the offense and related circumstances."
 
 
 [11]
 Fed.R.Civ.P. 23 provides, in material part:
 "(a) PREREQUISITES TO CLASS ACTION.
 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 (b) CLASS ACTIONS MAINTAINABLE.
 An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . . ."
 
 
 [12]
 A district court is accorded much discretion in determining whether an action shall proceed in class form. Where, as here, the district court has not operated under any erroneous legal premises in its application of the requirements of Fed.R.Civ.P. 23, its decision will be overturned only upon a showing that it abused its discretion. Wright v. Stone Container Corp., 524 F.2d 1058, 1061 (8th Cir. 1975); Paton v. LaPrade, 524 F.2d 862, 875 (3d Cir. 1975); Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239, 245 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); 3B Moore's Federal Practice 23-436 to 23-437 (2d ed. 1948); see also Lamphere v. Brown University, 553 F.2d 714, 720 (1st Cir. 1977) (recognizing wide discretion vested in district court over certification questions)
 
 
 [13]
 Part of plaintiff's individual claim concerned the racially hostile environment in which he worked. We do not decide whether, had plaintiff sought reinstatement (a return to the same environment), he could properly challenge, either on his own behalf or on that of a class of applicants, the alleged hiring barriers to the achievement of a balanced workforce. But see Williams v. Wallace Silversmiths, Inc., 75 F.R.D. 633, 635 (D.Conn.1976), appeal dismissed, 566 F.2d 364 (2d Cir. 1977) (past and present employees who assert an interest in ending their isolation at the company may not represent class of applicants seeking redress of discriminatory hiring procedures)
 
 
 [14]
 Plaintiff did refer to the subjective aspects in a discharge decision based on excessive absenteeism the personnel regulations do not mandate either the precise length of time after which an unexcused absence must be deemed excessive or the point at which an offending employee must be discharged. Had plaintiff's position been that this lack of absolute standardization is a violation of Title VII, class treatment might have been warranted. But plaintiff did not make such a frontal attack. His position was distinctly individualized that his absence was justified and that the determining factor for his discharge was not excessive absenteeism but rather was race related
 
 
 [15]
 To be sure, plaintiff's individual action was not free of potential class byproducts. Relevant to his individual claim, particularly his assertion that his absence was justified, was his claim of a racially hostile work environment (such as use of racial epithets, threats). Thus, in the every process of litigating his individual action plaintiff would essentially be challenging an employment condition with potential for affecting members of the class plaintiff purported to represent past, present, and future black civilian firefighters. Plaintiff did not specifically seek class relief in this aspect. Both his complaint and proposed findings of fact concentrated on hiring and promotion procedures
 
 
 [16]
 We recognize that an "across the board" attack on discriminatory employment practices has been permitted with a discharged employee representing embracive classes. Donaldson v. Pillsbury Co., 554 F.2d 825 (8th Cir.), cert. denied, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); Reed v. Arlington Hotel Co., 476 F.2d 721 (8th Cir.), cert. denied, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969). We do not now decide under what circumstances such an approach is permissible; we only conclude that when the claims of the named representatives are predominantly individualized and the establishment thereof has little potential for bringing into question any discrete, "across the board" employment practice, the district court does not abuse its discretion in denying class certification