**Donald ROCHON, et al., Plaintiffs,**

v.

**ATTORNEY GENERAL OF the UNITED STATES, et al., Defendants.**

**Civ. A. No. 87–3008.**

United States District Court, District of Columbia.

April 17, 1990.

**544**

David Kairys and Adam Thurschwell, Kairys & Rudovsky, Philadelphia, Pa., and David J. Shaffer of Arnold & Porter (local counsel), Washington, D.C. (Allan R. Stein, Rutgers University Law School, Camden, N.J., of counsel), for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., District of Columbia, Brook Hedge and David M. Glass, Dept. of Justice, Washington, D.C., for defendant the Atty. Gen.

CHARLES R. RICHEY, District Judge.

## I. *Introduction*

Plaintiffs, Donald Rochon, a black Federal Bureau of Investigation ("FBI") agent, and Susan Rochon, his wife, allege that they have been the victims of an ongoing conspiracy and campaign of racial discrimination, harassment, and retaliation that began when plaintiff Donald Rochon was assigned to the Omaha Office of the FBI in January, 1983 and that continued through his reassignment to FBI offices in Chicago and Philadelphia.

The specific allegations that plaintiffs make in their complaint defy all notions of human decency. Plaintiffs allege that for more than three years FBI agents and supervisors committed or condoned frequent acts of racial harassment against them. This harassment allegedly included hate mail, obscene phone calls, death threats as well as threats of mutilation, castration, sodomy, and rape, and the use of defaced pictures and photographs in what plaintiffs allege amounted to a campaign of ostracization and intimidation. It also included a campaign of forging plaintiff Donald Rochon's name to an insurance policy against death and dismemberment and to requests for more than $1000. of mail-order merchandise. In addition, plaintiffs allege that FBI supervisors condoned these acts of harassment and refused to take appropriate corrective action.[1]

Now before the Court are three motions for summary judgment filed by the Attorney General. These motions cover violations of Title VII of the Civil Rights Act of

---

1. For the prior history of this case, see *Rochon v. FBI*, 691 F.Supp. 1548 (D.D.C.1988) and *Rochon v. Attorney General of the United States*, 710 F.Supp. 377 (D.D.C.1989). Also of significance is a status conference held on January 19, 1990. At that status conference, with the consent of all the parties, the constitutional and common law tort claims and the 42 U.S.C. § 1985 claims against the defendants sued in their individual capacities, with the exception of the defendants Hegarty, Wilson, and Ahlerich, were dismissed, without prejudice.

1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e *et seq.* that plaintiffs allege took place from the time of the plaintiff Donald Rochon's arrival at the FBI's Chicago office through his transfer to the FBI's office in Philadelphia. The first motion covers the period of time when plaintiff was stationed in Chicago; the second motion addresses the circumstances surrounding plaintiff's transfer from Chicago to Philadelphia; and the third motion deals with the denial of certain relocation benefits which plaintiff requested in connection with his transfer from Chicago to Philadelphia.[2]

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." However, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Upon careful consideration of the Attorney General's three motions for summary judgment on plaintiff's Title VII claim, the supporting and opposing legal memoranda, the accompanying exhibits, and the underlying law, the Court finds that there are disputes as to genuine issues of material fact on each of these motions. Accordingly, the Court will deny each of them.

## II. *Title VII Violations in Chicago*

The Attorney General advances two reasons as to why he is entitled to summary judgment on plaintiff's Title VII claim arising out of his employment in Chicago. First, the Attorney General argues that plaintiff has failed to exhaust his administrative remedies with respect to the Title VII violations which allegedly took place in Chicago. In addition, the Attorney General maintains that he did not violate Title VII because he took reasonable and appropriate steps to put an end to any harassment that plaintiff experienced in Chicago. Finally, the Attorney General contends that even if the Court finds that he is not entitled to summary judgment on plaintiff's Title VII claim arising out of his employment in Chicago, he is entitled to have the scope of that claim narrowed because plaintiff's EEO complaint was untimely as to a portion of the Title VII violations alleged in plaintiff's judicial complaint. The Court will address the Attorney General's arguments in turn.

### A. Plaintiff has exhausted his administrative remedies.

■ There are certain administrative remedies that an employee must exhaust prior to filing a Title VII suit in federal district court. For federal employees, a prerequisite to filing a Title VII suit is the filing of an administrative complaint with the agency's EEO counselor. 29 C.F.R. § 1613.214(a)(1) (1989). "The principle functions of the administrative charge are to enable the Commission to provide notice to the alleged wrongdoer and to undertake conciliation." *Shehadeh v. Chesapeake & Potomac Tel. Co.,* 595 F.2d 711, 727 (D.C. Cir.1978). In evaluating the sufficiency of an EEO complaint, "the relevant inquiry is not whether the complainant has filed a detailed statement spelling out precisely his objections but whether the actions he did take were 'adequate to put the [agency] on notice.'" *Brown v. Marsh,* 777 F.2d 8, 13 (D.C.Cir.1985) (quoting *President v. Vance,* 627 F.2d 353, 361 (D.C.Cir.1980)); *see also McRae v. Librarian of Congress,* 843 F.2d 1494, 1496 (D.C.Cir.1988) (per curiam) ("[B]y requiring exhaustion before the agency in the first instance Congress did not intend to 'erect a massive procedural roadblock to access to the courts.' Rather, the exhaustion requirement is intended to give the agency the opportunity to right

---

**2.** From hereon in, when the Court uses the term "plaintiff," the Court is referring to the plaintiff Donald Rochon.

any wrong it may have committed."); 29 C.F.R. § 1601.12(b) (1989) ("[A] charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.").[3]

The Attorney General contends that plaintiff's administrative complaint, which was filed on January 8, 1986, is inadequate because it would not put a reasonable EEO Counselor on notice of the Title VII violations alleged in plaintiff's judicial complaint. The Attorney General characterizes the crux of plaintiff's judicial complaint as the failure of plaintiff's supervisors and managers to investigate the complaints of harassment which he had made.[4] According to the Attorney General, plaintiff's EEO complaint "has quite a different focus. The gravamen of [the administrative complaint] is that, because SA Rochon had undergone a campaign of harassment at the hands of the 'unique Omaha and Chicago office clique,' the FBI had violated his rights by failing to respond in more than an 'ambiguous' fashion to his request for a transfer away from Chicago."[5] After comparing what he perceives to be the heart of plaintiff's administrative complaint with that of his judicial complaint, the Attorney General concludes that "a 'reasonably diligent EEO counselor' would not have been put on notice that the [administrative] complaint challenged the alleged failure of the FBI's 'supervisors and managers' to conduct suitable investigations in response to the complaints of harassment that SA Rochon had submitted."[6]

The Court disagrees with how the Attorney General has chosen to characterize plaintiff's administrative complaint. One does not have to unravel or dissect the language of plaintiff's administrative complaint to find notice of a claim that plaintiff's supervisors failed to take appropriate investigative and corrective measures in response to his complaints of racial harassment. The plain language of the complaint, and in particular its opening paragraph, furnishes such notice.

In the first paragraph to his administrative complaint, plaintiff states:

This complaint of discrimination is based on the FEDERAL BUREAU OF INVESTIGATION'S (FBI) failure to provide a dignified working and living environment free of racially motivated harassment and death threats against me and my family by fellow employees.[7]

In his administrative complaint, plaintiff also alleges that he brought to his superiors' attention specific acts of racial harassment which he experienced and the persons he believed to have committed the acts. In addition, plaintiff alleges that his superiors did not take the appropriate corrective action of transferring him to another office because of his pending EEO complaint concerning events in Omaha. Plaintiff's mention of his superiors' failing to transfer him to another office is by no means the focus of his administrative complaint, but rather an illustration of how his superiors tolerated a working environment laden with racial harassment.

B. Material facts remain in dispute as to whether the Attorney General took appropriate investigative and corrective action in response to plaintiff's complaints of racial harassment.

■ "[Racial] harassment by a co-employee is not a violation of Title VII unless

---

**3.** The Attorney General argues that plaintiff should be held to a more rigorous standard because he has a law degree. The Court disagrees. A person who has graduated from law school is not necessarily skilled in drafting complaints or knowledgeable about the application of Title VII. Moreover, there is nothing in the record to suggest that plaintiff has ever been admitted to a bar or has been a practicing lawyer. This reminds the Court of the old saying that he [the lawyer] who represents himself has a fool for a client.

**4.** *Motion of the Attorney General for Summary Judgment as to Plaintiff's Chicago Claims* at 72.

**5.** *Id.* at 72–73.

**6.** *Id.* at 74.

**7.** Administrative Complaint (Jan. 8, 1986) (Exhibit C to Plaintiffs' Opposition to Motion of Attorney General for Summary Judgment as to Plaintiffs' "Chicago Claims").

the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Katz v. Dole*, 709 F.2d 251, 255 (4th Cir. 1983); *see also Bundy v. Jackson*, 641 F.2d 934, 947 (D.C.Cir.1981) ("An employer may negate liability by taking 'immediate and appropriate corrective action when it learns of any illegal harassment.'"); *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 (1st Cir.1980) ("[O]nce an employer has in good faith taken those measures which are both feasibile and reasonable under the circumstances to combat the offensive conduct ...·, [the employer cannot] be charged with discriminating on the basis of race."). An employer is not absolved of Title VII liability simply by virtue of having taken some corrective action. "Rather, the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not 'reasonably calculated' to halt the harassment." *Waltman v. International Paper Co.*, 875 F.2d 468, 479 (5th Cir.1989). Whether an employer's response was appropriate will depend on the specific facts and circumstances of the case. "Factors that may be considered are the gravity of the harm, the nature of the work environment, and the resources available to the employer." *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2nd Cir.1986).

This is clearly not a case of an employer sitting back idly and ignoring an employee's complaints of racial harassment. Plaintiff does not dispute that the Attorney General's response to his complaints included the taking of statements under oath or affirmation, laboratory analyses on some of the suspicious mail plaintiff received, the performance of a polygraph test on at least one person who provided a statement, and the punishment of the one wrongdoer who was ascertained. Rather, plaintiff disagrees with the Attorney General's conclu-

sion that the investigatory and corrective measures he took were adequate.

Even though plaintiff has not had the benefit of discovery on his Title VII claim, plaintiff provides some specific reasons as to why he considers the Attorney General's remedial course to have been inadequate. Some of plaintiff's reasons include: (1) the refusal of plaintiff's supervisors to arrange for "phone traces or recordings" on his phones at home and at the office during the time period he was receiving harassing calls; [8] (2) plaintiff's supervisors telling him that he was not to make reports of racial harassment outside the FBI, such as to the Department of Justice; [9] (3) the deviation of plaintiff's supervisors from standard FBI investigatory procedures when they investigated plaintiff's complaints of racial harassment; [10] (4) the fact that plaintiff was required to stay in the Chicago office for a year after he requested a "hardship transfer" to another office in order to escape the harassment at the Chicago office; (5) plaintiff's transfer to a less desirable squad when he complained of acts of harassment by members of his squad; [11] (6) the fact that Special Agent Gary Miller received a relatively light punishment for the acts of harassment he committed against plaintiff when compared to "discipline routinely imposed on FBI agents for conduct that is far less culpable." [12]

If the evidence plaintiff has offered to demonstrate that the Attorney General's remedial measures were inadequate is to be believed, which it must at this juncture, the Court has no choice but to find that a genuine issue of material fact exists as to whether the Attorney General's responses to plaintiff's complaint were adequate.

C. Material facts remain in dispute as to whether plaintiff was timely in notifying an EEO counselor of all the Title VII violations alleged in his judicial complaint.

██ Before filing an administrative complaint, a federal employee is required to

---

**8.** Affidavit of Donald Rochon (Exhibit E to Plaintiffs' Opposition to Motion of Attorney General for Summary Judgment as to Plaintiffs' "Chicago Claims") at ¶ 10.

**9.** *Id.* at ¶¶ 13 and 18.

**10.** *Id.* at ¶¶ 16 and 17.

**11.** *Id.* at ¶ 14.

**12.** *Id.* at ¶ 24.

bring to an EEO counselor's attention any discriminatory conduct within thirty days of the date of the discriminatory conduct or within thirty days of the date the employee knew or reasonably should have known of the discriminatory conduct. 29 C.F.R. § 1613.214(a)(i) (1989). An equitable exception to the thirty day time limitation for contacting an EEO counselor is " '[w]here the unlawful employment practice manifests itself over time, rather than as a series of discrete acts.' " *Waltman*, 875 F.2d at 474 (quoting *Abrams v. Baylor College*, 805 F.2d 528, 532 (5th Cir.1986)). "In order to sustain a claim under this exception, known as a continuing violation, the plaintiff must show that at least one incident of harassment occurred within the [thirty] day period." In deciding whether a plaintiff has asserted a valid claim for a continuing violation, there are several factors to consider:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision. The third factor, perhaps of most importance is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate.

*Id.* (quoting *Berry v. Board of Supervisors of Louisiana State University*, 715 F.2d 971, 981 (5th Cir.1983), *cert. denied*, 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986)).

The earliest Title VII violations alleged by plaintiff took place immediately upon his arrival at the Chicago office in June, 1984. These violations include someone leaving a bag from Popeye's Fried Chicken containing chicken bones on his desk, the placement of chocolate on his telephone receiver, the removal of his desk key from its ordinary location, the placement of a derogatory newspaper article about Jesse Jackson on his desk, and the receipt of harassing phone calls at home and at work. However, December 3, 1984 is the earliest date in the record, as it now stands, for plaintiff having contacted an EEO counselor at the Chicago office.

The Attorney General argues that plaintiff should be precluded from including in his judicial complaint Title VII violations that allegedly took place before November 4, 1984 because the harassment plaintiff allegedly experienced was of a permanent nature. As such, plaintiff should have been on notice that he had a duty to assert his rights well before December 3, 1984.

The Court is puzzled about plaintiff's reliance on the continuing violation exception because the record before the Court indicates that plaintiff asserted his rights as early as June, 1984. Plaintiff has represented, under oath or affirmation, that:

> I orally reported the harassing incidents to Special Agent Linda Brown, the office EEO Counselor, as the harassing incidents occurred, including reporting the "chocolate on the phone" incident on the day it occurred, my first day in the Chicago office. She was terminated in November 1984.[13]

Plaintiff's prior contacts with Special Agent Brown are reflected in the EEO Report of Counseling that Special Agent Jane Koshutko prepared after she met with plaintiff on December 3, 1984.[14] Plaintiff's representations as to his prior contacts with Special Agent Brown and their confirmation in Special Agent Koshutko's Report of Counseling lead to the ineluctable conclusion that plaintiff was aware that he was being harassed on account of his race

---

13. *Id.* at ¶ 8.

14. Report of Counseling (submitted Jan. 23, 1986) (Exhibit C to Plaintiff's Opposition to Motion of Attorney General for Summary Judgment as to Plaintiff's Chicago Claims). In that Report of Counseling, Special Agent Koshutko wrote: "SA Rochon had contacted former EEOC Linda Brown prior to contact with SA Koshutko." *Id.* at 2.

from the time he arrived at the Chicago office. As such, the continuing violation exception is not available to plaintiff because he had "reason to believe he was a victim of discrimination [before] a series of adverse actions established a visible pattern of discriminatory treatment." *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989).

Because of plaintiff's several contacts with an EEO Counselor prior to December 3, 1984, the Court has reason to suspect that plaintiff may have brought some or all of the Title VII violations alleged in his judicial complaint, which took place prior to November 3, 1984, to the attention of an EEO counselor within thirty days of the date of those violations or the date he had reason to know of them. Since the Court has not been furnished with all of the EEO records for plaintiff for the time period of June, 1984 to December 3, 1984, there is a genuine issue of material fact as to whether plaintiff was timely in contacting an EEO counselor about all of the Title VII violations alleged in his judicial complaint.

III. *The Chicago–Philadelphia Transfer*

■ The Attorney General describes the sequence of events leading to plaintiff's transfer to Philadelphia as follows: In June, 1985, a year after his arrival in Chicago, plaintiff requested a transfer to a "neutral" office where he could escape the harassment he was experiencing in Chicago. When plaintiff made his request, he said he would go to any office other than the one in Los Angeles because a transfer to Los Angeles would have the appearance of being an "award." [15] On November 21, 1985, plaintiff visited the Offices of the Special Agent Transfer United ("SATU") at FBI Headquarters in Washington, DC and inquired of David Rarity, Jr., the head of SATU, as to the status of his transfer request. Plaintiff told Rarity that he was requesting a transfer to any office that would be neutral. Thereafter, on February 12, 1986, plaintiff was given a choice of transferring to one of four locations—Detroit, Newark, New York, or Philadelphia. Plaintiff chose Philadelphia. The Attorney General contends that since plaintiff got precisely what he requested—a transfer to any neutral office—he is precluded from now complaining that his transfer to Philadelphia amounted to an act of discrimination and retaliation. Accordingly, the Attorney General maintains that he is entitled to summary judgment on any Title VII violations allegedly arising out of plaintiff's transfer to Philadelphia.

Based on the Attorney General's chronology of events leading to plaintiff's transfer to Philadelphia, one could easily be led to believe that plaintiff was given precisely what he requested when he was transferred to Philadelphia. Noticeably lacking from the Attorney General's chronology, however, are several events included in plaintiff's chronology which undercut the Attorney General's argument that plaintiff's transfer to Philadelphia was precisely what plaintiff requested. These events include: the denial of plaintiff's request in August 1984 for a transfer to Puerto Rico to escape harassment in the Chicago office; a letter Rarity wrote, dated November 25, 1989, in response to a letter written by plaintiff's attorney stating plaintiff's request for a transfer "will be reviewed and afforded every possible consideration upon resolution of the EEO complaint your client has submitted;" [16] plaintiffs filing an EEO complaint on January 8, 1986 because of his transfer request not being acted upon

---

**15.** To escape the discrimination plaintiff experienced in Omaha, he requested a transfer to Los Angeles, where his sick father lived. Plaintiff's request was denied, and he was instead transferred to Chicago where one of the instigators of much of the discrimination plaintiff experienced in Omaha had been recently transferred. Plaintiff filed an administrative complaint covering the discrimination he experienced in Omaha and his transfer to Chicago instead of Los Angeles; that complaint was still pending when plaintiff asked for a transfer away from Chica-go. As such, plaintiff asked not to be transferred from Chicago to Los Angeles because such a transfer would have had the appearance of being an "award."

**16.** Letter from David Rarity, Jr. to Andrew Mean von Salis (Nov. 5, 1985) (Exh. E to Plaintiff Donald Rochon's Opposition to Motions of Attorney General for Summary Judgment as to the Chicago–Philadelphia Transfer and "Philadelphia Claims").

and asking as relief a transfer to the location of his choice; a memorandum, Special Agent in Charge Edward Hegarty authored and sent to FBI Headquarters on January 23, 1986 concerning plaintiff's transfer;[17] plaintiff being advised on February 12, 1986 that he had twenty-four hours to decide whether his transfer would be to Detroit, Newark, New York, or Philadelphia; and the commencement of plaintiff's assignment to Philadelphia on June 15, 1986.

After comparing the Attorney's chronology of events leading to plaintiff's transfer to Philadelphia with plaintiff's chronology, the Court finds that there is a genuine issue of material fact as to the reasons for plaintiff's transfer to Philadelphia. Accordingly, the Court will deny the Attorney General's motion for summary judgment as to the Chicago–Philadelphia transfer.

### IV. *The Philadelphia Claims*

■ In his judicial complaint, plaintiff alleges that Assistant Director Edwin Sharp's denial of his request to be reimbursed by the FBI for an additional sixty-six days of temporary quarters expenses incurred in connection with his transfer to Philadelphia was yet another act of discrimination and retaliation.[18]

The events leading to Sharp's denial of plaintiff's request are as follows: On March 25, 1986, a little less than four weeks after plaintiff learned that he would be relocated to Philadelphia, plaintiff entered the FBI's Relocation Services Program. This program offered to buy plaintiff's home on April 25, 1986; plaintiff accepted the program's offer and received $53,453.38, the amount of equity he had in his home. In the middle of April, 1986, plaintiff travelled to Philadelphia, at the FBI's expense, to search for a new home. At the end of his trip to Philadelphia, plaintiff put a deposit down on a home. Prior to going to Philadelphia to report for duty, plaintiff learned that the house he intended to move into would be completed substantially later than had been anticipated. As such, he withdrew his offer and his deposit was returned to him.[19] When plaintiff reported for duty on June 15, 1986, plaintiff moved into temporary quarters at the government's expense. On July 2, 1986, plaintiff made a deposit on another home. Shortly after making the deposit, plaintiff learned that there would be a delay in the completion of the house. At plaintiff's request, the FBI's payment of plaintiff's expenses for temporary quarters was extended for an additional thirty days. In July, 1986, plaintiff made offers on two additional homes; both of these offers were rejected. Finally, on August 11, 1986, plaintiff located a home; settlement on this house could not be before October 17, 1986. As such, plaintiff requested the FBI to pay his expenses for temporary quarters for an additional sixty days.[20] Assistant Director

---

**17.** In the recommendations section of the memorandum, Hegarty wrote:

> The totality of the information provided concerning SA ROCHON and his allegations both in Omaha and in Chicago, exemplify a chronic and deeply seeded problem with this employee. Whether the allegations have been founded or unfounded, the fact remains that over a period of time there will be continued allegations, the purpose of which appears to be a deliberate and continuous effort on his part to be transferred to the West Coast, more particularly to his home in Los Angeles.

> Based on Chicago's experience with SA ROCHON, there is no question that he must be transferred from the Chicago Division. However, it is Chicago's opinion that prior to that recommendation being effected, *all* files pertaining to ROCHON should be reviewed at FBIHQ and assessed to ascertain whether SA ROCHON should be examined by a qualified psychiatrist to determine his fitness for duty.

Airtel to Director, FBI from SAC, Chicago (Jan. 23, 1986) (Exh. K to Plaintiff Donald Rochon's Opposition to Motions of Attorney General for Summary Judgment as to Chicago–Philadelphia Transfer and "Philadelphia Claims").

**18.** *Second Amended Complaint* at ¶¶ 75, 76, and 93(c). The statutory provision governing the payment of relocation expenses incurred by federal employees can be found at 5 U.S.C. § 5724a.

**19.** The parties disagree when plaintiff learned that the house would be ready substantially later than had been anticipated. The Attorney General states that this happened in early May; plaintiff asserts that this occurred in early June.

**20.** The statutory provision governing the extension of a federal employee's reimbursement for expenses associated with living in temporary quarters for an additional sixty days provides

Sharp denied plaintiff's request on the ground that plaintiff's search for permanent housing during his househunting trip and his initial sixty days in temporary quarters was not aggressive when compared with that of other employees transferred to the Philadelphia area.[21]

The Attorney General offers several pieces of evidence to support his position that the length of time it took plaintiff to find a new home in the Philadelphia area could have been abbreviated had plaintiff been more diligent in his search. This evidence includes an airtel prepared by the Director of the FBI, dated May 31, 1985, which provides "an employee should make every effort to reduce or even eliminate the need to occupy temporary quarters if a househunting trip is taken; and that an employee selling a residence through the Bureau's Relocation Services Program should not be required to occupy temporary quarters past the initial 60 days;"[22] the real estate listings in the *Philadelphia Inquirer* for a Sunday in July, 1986; and the number of temporary quarters extensions accorded to employees moving to the Philadelphia area during roughly the same time period in which plaintiff moved to Philadelphia.[23]

To counter the Attorney General's position that plaintiff would have found a home in the Philadelphia area sooner had he been more diligent in his search, plaintiff relies primarily on a memorandum, dated August 29, 1986, that the Special Agent in Charge in Philadelphia sent to the attention of the Assistant Director. This memorandum, in pertinent part, states:

> During SA ROCHON's second 30 day period of temporary quarters, he actively attempted to locate a permanent residence during his off duty time. It should be noted that due to lower interest rates, there has been a shortage of suitable housing in the Philadelphia area, making purchasing a home difficult.
>
> .    .    .    .    .
>
> SA ROCHON's second 30 day [sic] of temporary quarters expired on 8/13/86. He is attempting to expedite the settlement of his new home as quickly as possible. A tentative settlement date of 10/17/86 has been scheduled. As a result of the tight housing market in the Philadelphia area and SA ROCHON's good faith effort to locate a permanent residence during the first 60 days of temporary quarters, it is requested that extension of temporary quarters be granted.[24]

Moreover, to support his conclusion that the denial of his request for an extension of his reimbursement for temporary quarters expenses was an act of discrimination, plaintiff points to the fact that his request was denied by Assistant Director Sharp, the highest ranking official that the EEOC and the Department of Justice found to have discriminated and retaliated against

---

that such extension may be granted "if the head of the agency concerned or his designee determines that there are compelling reasons for the continued occupancy of temporary quarters." 5 U.S.C. § 5274a(a)(3).

21. Airtel from Acting Director, FBI to SAC, Philadelphia (Aug. 25, 1987) (Exhibit N to Motion of Attorney General for Summary Judgment as to Plaintiffs' "Philadelphia Claims") at 2.

22. Airtel from Director, FBI to All SACs and LEGATs (May 31, 1985) (Exh. P to Motion of Attorney General for Summary Judgment as to Plaintiffs' "Philadelphia Claims").

23. The Attorney General has not furnished the Court or plaintiff with the precise details concerning the house searches of these employees. For instance, it is unknown whether these employees learned, subsequent to putting down deposits on two homes, that there would be an unanticipated delay in the completion of the homes.

24. Airtel to Director, FBI from SAC, Philadelphia (Aug. 29, 1986) (Exh. H to Plaintiff Donald Rochon's Opposition to Motions of the Attorney General for Summary Judgment as to the Chicago–Philadelphia Transfer and "Philadelphia Claims") at 1–2.

The Attorney General argues that plaintiff's reliance on this memorandum is "self-serving" because the memorandum bears the initials "DR:km" at the bottom of the first page. *Reply Brief In Support of the Motion of the Attorney General for Summary Judgment as to Plaintiffs' "Philadelphia Claims"* at 5–6. The Court is not ready to disregard this memorandum as simply "self-serving" until it knows more about the circumstances surrounding the creation of the memorandum.

**552**

plaintiff in connection with his transfer from Omaha to Chicago.

The Court finds that the evidence presented by plaintiff is sufficient to raise a genuine issue of material fact as to the reason for Assistant Director Sharp's denial of plaintiff's request to be reimbursed for the expense of staying in temporary quarters for an additional sixty days. Accordingly, the Court will deny the Attorney General's motion for summary judgment on plaintiff's "Philadelphia Claims."

The Court will issue an Order of even date herewith memorializing these findings.