**SECURITIES AND EXCHANGE COMMISSION, Plaintiff, Appellee,**

v.

**LEHMAN BROTHERS, INC., Relief Defendant, Appellant.**

No. 98–1228.

United States Court of Appeals, First Circuit.

Heard July 28, 1998.
Decided Oct. 5, 1998.

John D. Donovan, Jr. with whom Mark P. Szpak, Crystal D. Talley and Ropes & Gray were on brief for appellant.

Henry F. Minnerop, Brown & Wood LLP, Stuart J. Kaswell and Fredda L. Plesser, Office of the General Counsel, on brief for Securities Industry Association, Inc., Amicus Curiae.

Mark Pennington, Senior Litigation Counsel, Securities and Exchange Com'n, with whom Colleen P. Mahoney, Acting General Counsel, Jacob H. Stillman, Assoc. General Counsel, Diane V. White, Senior Counsel, and Paul Gonson, Solicitor, were on brief for appellee.

Before SELYA, BOUDIN and LIPEZ, Circuit Judges.

BOUDIN, Circuit Judge.

This difficult case concerns a preliminary injunction obtained by the Securities and Exchange Commission to freeze certain assets in the brokerage account of Emanuel Pinez who (according to the SEC) secured those assets through unlawful insider trading. The assets were held in Pinez's brokerage account with Lehman Brothers, Inc., which claimed an overriding security interest in the assets. Having failed to persuade the district court on this point, Lehman Brothers now appeals.

The background facts are essentially undisputed. Pinez, who was chairman of Centennial Technology, Inc., opened a personal brokerage account with Lehman Brothers in February 1996. Frederick E. Pierce II became Pinez's account representative at Lehman Brothers. In September 1996, Pinez executed a margin account agreement with Lehman Brothers (explicitly to be governed by New York law); the agreement permitted him to borrow from Lehman Brothers to cover a portion of the cost of his purchases. The agreement also gave Lehman Brothers a security interest as collateral for any margin debt in all assets held in the account.

During 1996, Centennial stock performed remarkably well, reaching a high of $58 per share in December 1996. According to the SEC, the reason was fraudulent bookkeeping by Pinez, including fictitious sales and inventory figures. Indeed, after the events to be recounted, the company revised its financial statements to show a $28 million loss for the three-and-a-half years ending in December 1996, rather than the $12 million profit originally reported.

Well before this public restatement, reports began to appear in newspapers in January and February 1997, suggesting doubts about Centennial's earnings and management. Throughout January 1997, the price of Centennial stock fell, reaching $23.75 on January 31, 1997. On February 5, 1997, Centennial's board of directors set up a special committee to investigate the company's earnings, and the vice chairman of the board told Pinez the next day that Pinez would likely have to leave if the company had to restate its earnings.

On February 7, 1997, Pinez called Pierce and directed him to arrange a "zero-cost collar" on Centennial stock owned by Pinez; Pinez then had almost $10 million in Centennial stock (at thencurrent market prices) in his Lehman Brothers account. Pinez's apparent purpose was to ensure that he would

have the necessary funds to cover his $5 million margin-account debt with Lehman Brothers even if the market price of his Centennial-stock collateral fell sharply and led Lehman Brothers to demand immediate payment of the debt, as it was entitled to do under the margin account agreement.

A zero-cost collar involves two contemporaneous transactions: the sale (here, by Pinez) of call options, giving the option buyers the right to purchase from the seller up to a certain amount of the stock at a fixed price, and the purchase (again by Pinez) of an equal number of put options, giving the buyer the right to sell a similar amount of stock to the sellers of the puts at some future period at a similar or closely related fixed price.[1] What matters here is that the put options that Pinez acquired became assets held in his Lehman Brothers margin account.

When Pinez called Pierce on February 7, 1997, Pierce asked whether Pinez was in a "quiet period," during which he would be precluded from trading in Centennial securities; Pinez said that he was not. Pierce then obtained the necessary approvals from Lehman Brothers. Pierce filled the order the same afternoon, selling 2700 Centennial "call" options and purchasing 2700 Centennial "put" options. At this time, Pinez's account at Lehman Brothers held securities (mostly Centennial stock) providing barely adequate collateral for Pinez's total margin debt.

Whatever Lehman Brothers should or might have suspected on February 7, 1997, there is no claim by the SEC that Lehman Brothers knew at that time either that Pinez had falsified Centennial's financial statements or that this possibility was under investigation by Centennial's board. However, on February 11, 1997, Centennial announced publicly that it was undertaking an inquiry into its earlier financial statements, that it had removed Pinez from its management,

---

1. To simplify slightly, Pinez sold 2,700 call options allowing others to buy from him Centennial stock at about $20 per share, close to the market price at the time, and Pinez used the receipts from that sale to buy an equal number of put options allowing him to sell the stock to others at the same or a closely related price during the same period. Effectively, such a transaction shifts to the seller of the puts (for the period of the option) the main risk that the stock will fall and shifts to the buyers of the calls the main benefit from an increase in the stock price during the same period.

and that the New York Stock Exchange had suspended trading in Centennial stock. Lehman Brothers issued an immediate margin call demanding that Pinez pay it all outstanding margin debt, then more than $6 million. Pinez failed to do so. Lehman Brothers now had a contractual claim against Pinez for his margin debt, a claim Lehman Brothers much later reduced to a state-court judgment.

In the meantime, one of the valuable assets in the Pinez account was the 2700 put contracts giving Pinez as put owner the right to make the unfortunate put sellers pay $20 per share for Centennial stock now worth much less. Before Lehman Brothers could take advantage of this opportunity to dispose of its security, the SEC on February 14, 1997, brought the present civil action in the district court and obtained an *ex parte* temporary restraining order "freezing" all assets in Pinez accounts with various financial institutions, including Lehman Brothers. The government also began criminal proceedings against Pinez.

The SEC's civil action, out of which the present appeal grows, charged Pinez with having secured the put options through the unlawful use of inside information—specifically, knowledge that Centennial's financial health was much worse than publicly known—in violation of various securities law requirements, primarily section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Lehman Brothers was later named in an amended complaint as a "relief defendant." One object of the complaint was to require "disgorgement" by Pinez of his "ill-gotten gains," including the put options that are the subject of this case. By agreement of the parties, the put options were liquidated before they expired, so the controversy is now about the proceeds.[2]

Following the grant of the temporary restraining order, the district court held a hearing on March 6, 1997, on the SEC's request to transform the now expired TRO into a preliminary injunction. Despite the expiration of the TRO, Lehman Brothers, as a courtesy to the court, agreed to maintain the proceeds derived from the put options in an escrow account while the court considered the SEC's motion. Those proceeds now represent almost $5 million, which Lehman Brothers says is barely enough to cover the still unpaid portion of Pinez's margin-account debt.

On December 16, 1997, the district court released a memorandum and order granting the instant preliminary injunction insofar as it maintained a freeze on Pinez's assets, including the put option proceeds held in escrow by Lehman Brothers. *SEC v. Pinez*, 989 F.Supp. 325 (D.Mass.1997). After detailed analysis of federal and state law, the court concluded that at trial the SEC was likely to establish not only that Pinez had committed fraud in acquiring the put options, but also that "Lehman [Brothers] is not a bona fide purchaser of those securities...." *Id.* at 345. This appeal followed.

In this court, Lehman Brothers has assumed that but for its asserted security interest in the margin account assets, the SEC would have a valid claim to recoup the proceeds as the product of an unlawful transaction by Pinez (the put options purchases). Conversely, the SEC has assumed that its claim to the proceeds is subordinated *if* Lehman Brothers is treated as a bona fide purchaser of the put options for value; the SEC does not dispute that Lehman Brothers should be treated as a purchaser for value, and the relevant law supports this concession.[3]

Accordingly, the dispute—as framed by the parties—is whether Lehman Brothers is a bona fide purchaser. We accept the assumptions of the parties but do not independently endorse them. *Cf. In re Newport Plaza Assoc. v. Durfee Attleboro Bank*, 985

---

**2.** The SEC complaint is somewhat more complicated than just described, relying on other theories of recovery in addition to section 10(b) and asserting separate claims against another defendant. Those aspects of the complaint do not affect the outcome on this appeal.

**3.** *See* N.Y.U.C.C. § 1–201(32) (McKinney 1987) (including within the definition of purchase the

"taking by sale ... negotiating, mortgage, pledge, lien ... or any other voluntary transaction creating an interest in property"); *Kittredge v. Grannis*, 236 N.Y. 375, 140 N.E. 730 (N.Y. 1923), *rearg. denied*, 236 N.Y. 637, 142 N.E. 315 (N.Y.1923).

F.2d 640, 643–44 (1st Cir.1993). As to the law governing Lehman Brothers' status as a bona fide purchaser, the SEC regards the issue as governed by New York law, while Lehman Brothers invokes federal securities law. We address the legal issues in that order.

New York law is a sound starting point because in this instance, as in most commercial transactions, state law provides the matrix of background rules and is ordinarily displaced, if at all, only by conflicting, field-occupying provisions of federal statutory law, or occasionally by federal common law. *See Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997); *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966). Here, the margin account agreement relied on by Lehman Brothers for its priority is expressly governed by New York law.

The parties agree that save as federal law may dictate otherwise, Lehman Brothers' rights to the proceeds vis-a-vis the SEC are controlled by article 8 of New York's Uniform Commercial Code, N.Y.U.C.C. § 8–301 *et seq.* (McKinney 1987). Article 8 governs investment securities, and section 8–302 defines a "bona fide purchaser" as "a purchaser for value in good faith and without notice of any adverse claim" who obtains a security (under certain specified conditions which the SEC here assumes to have been satisfied). Section 8–302(3) then provides: "A bona fide purchaser in addition to acquiring the rights of a purchaser (Section 8–301) also acquires his interest in the security free of any adverse claim."

"Adverse claim" is defined in fairly general terms (in section 8–302(2)) but we need not pursue the subject because the SEC appears to assume that its own claim for "disgorgement" of the put options (or their proceeds) constitutes an adverse claim that would not prevail against a bona fide purchaser. Instead, it says that it is entitled to prevail over Lehman Brothers because Lehman Brothers, even though a "purchaser for value," was not one "in good faith and without notice of any adverse claim." N.Y.U.C.C. § 8–302.

■ The factual predicate for the SEC's position is that Pinez was known to be an insider, he was engaging in a transaction that made a good deal of sense if one expected a dip in the price of his stock, and there was some public information suggesting that the company might be in more difficulty than its past financial reports would indicate. These facts are undisputed and we will assume, in unison with the SEC, that they amply amount to suspicious circumstances that should have alerted Lehman Brothers to the possibility of trouble.

The key to the SEC's legal argument is that Lehman Brothers' disregard of "suspicious circumstances" deprives it of bona fide purchaser status (Lehman Brothers did make a brief inquiry of Pinez as already recounted, but no more). In the words of the district court, which took a similar view of New York law, "a failure to act on actual knowledge of suspicious circumstances constitutes bad faith on the part of a lienholder" and thereby defeats a claim of bona fide purchaser status. *Pinez*, 989 F.Supp. at 344. Lehman Brothers, by contrast, asserts in its brief that under New York's UCC, "good faith" is *"entirely* 'subjective,' *and* that it *excludes* any duty of inquiry."

We adopt neither position outright, but think that the law is closer to Lehman Brothers' view. In our view, the emphasis in the New York case law is on subjective bad faith and dishonesty,[4] an emphasis echoed in parallel provisions of section 3–304 which—in relation to commercial paper—describe no-

---

4. *See Hartford Accident & Indemnity Co. v. American Express*, 74 N.Y.2d 153, 544 N.Y.S.2d 573, 542 N.E.2d 1090, 1095 (N.Y.1989) (holding that "UCC 3–304(7) demands nothing less than actual knowledge of the claim against the instrument or of facts indicating bad faith in taking the instrument"); *Chemical Bank of Rochester v. Haskell*, 51 N.Y.2d 85, 432 N.Y.S.2d 478, 411 N.E.2d 1339, 1341 (N.Y.1980) ("If [a party] did not have actual knowledge of some fact which would pre-

vent a commercially honest individual from taking up the instruments, then its good faith was sufficiently shown."); *Hall v. Bank of Blasdell*, 306 N.Y. 336, 118 N.E.2d 464, 467 (N.Y.1954) ("One who purchases commercial paper for full value ... is not bound at his peril to be upon the alert for circumstances which might possibly excite the suspicion of wary vigilance.") (quoting *Manufacturers & Traders Trust Co. v. Sapowitch*, 296 N.Y. 226, 72 N.E.2d 166, 168 (N.Y.1947)).

tice of a claim or defense as including "knowledge of such facts that his action in taking the instrument amounts to bad faith." N.Y.U.C.C. § 3–304(7) (McKinney 1987). Although the case law provides the decisive gloss, plain language confirms it: in ordinary parlance, one can certainly be "suspicious" without being dishonest in deciding to proceed with a transaction where suspicions are outweighed by competing considerations.

New York has deliberately adopted a standard somewhat more favorable to the recipient of the securities than have a number of other states. As New York's highest court has noted, New York and Virginia are the only states to insist that notice "be determined by a subjective test of actual knowledge." *Hartford*, 544 N.Y.S.2d 573, 542 N.E.2d at 1094; *see also Chemical Bank,* 411 N.E.2d at 1341; *cf. Lawton v. Walker,* 231 Va. 247, 343 S.E.2d 335, 337–38 (Va.1986) (construing the parallel provision of the Virginia UCC § 8.3–304). Where one draws the line in requiring more or less inquiry by the purchaser is a policy choice; the New York legislature could plausibly choose to facilitate stock transactions by limiting the obligation to inquire and giving bona fide purchaser status a generous reach.

The SEC points to cases that forbid someone from deliberately averting his eyes from evident misconduct.[5] We agree that such conduct, even if literally short of actual knowledge, could fairly be equated with dishonesty or bad faith. But there is nothing in the facts before us to suggest that Pinez's use of a "collar" transaction could only be explained by the use of inside information. Nor has the SEC shown that Lehman Brothers deliberately closed its eyes to some easily obtained information that would have confirmed that Pinez was engaging in securities fraud.

Indeed, we can imagine in extreme circumstances imputing bad faith to a purchaser who had very strong suspicions of grave misconduct, who could readily have verified or dispelled the suspicion, and who failed to do so without any plausible excuse. To this limited extent, there may be a duty of inquiry where a failure to inquire amounts to bad faith. But here, misconduct was merely a possibility; Lehman Brothers had been directed to execute an immediate transaction, and the SEC does not suggest how it could have swiftly and definitely assured itself that no insider information had been used.

Taking New York law to require dishonesty and not mere suspicion, and applying that standard to the facts currently of record, we do not think that the SEC has shown a reasonable likelihood of prevailing against Lehman Brothers on the merits. This disagreement with the able district judge rests primarily on our reading of New York law, which we assess *de novo.* Of course, the present record does not reflect an evidentiary hearing, let alone a full trial; whether eventually the SEC might adduce more facts that would meet the dishonesty standard is another matter.

This brings us to the question whether federal law supersedes state law, either in favor of Lehman Brothers or in favor of the SEC. Lehman Brothers relies on two provisions of the federal securities law, which it reads as saying that only "actual knowledge" of Pinez's violation would impair its security interest. Conversely, the district judge, but not the SEC, thinks that a third provision of the federal securities laws makes suspicious circumstances enough. We think that none of the three provisions cited alters the result in this case.

Lehman Brothers first relies upon section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b). In pertinent part, section 29(b) provides as follows:

> Every contract made in violation of any provision of this chapter ... shall be void (1) as regards to the rights of any person who, in violation of any such provision ... shall have made or engaged in the performance of any such contract, and (2) as regards to the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with

5. *See Graham v. White-Phillips Co.,* 296 U.S. 27, 31–32, 56 S.Ct. 21, 80 L.Ed. 20 (1935); *Otten v. Marasco,* 353 F.2d 563, 565 (2d Cir.1965); *First Nat'l Bank v. Fazzari,* 10 N.Y.2d 394, 223 N.Y.S.2d 483, 179 N.E.2d 493, 496 (N.Y.1961).

actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision. . . .

Relying on subsection (2), Lehman Brothers argues that the "actual knowledge" requirement controls, with no ifs or buts based on suspicious circumstances.

We will assume without deciding that Lehman Brothers is right in its reading of the phrase "actual knowledge." We will also assume that Lehman Brothers is a person who, "not being a party" to such put option contracts, acquired a right thereunder, namely, the right as successor to Pinez to enforce the put options contracts. It therefore would follow from these (untested) assumptions that Lehman Brothers could defeat any claim under section 29(b) by the put options sellers that, because of Pinez's violation, the contracts were "void." [6]

But subsections (1) and (2) are merely limitations on the consequences that would otherwise be visited by the principal directive of section 29(b), namely, that the options contracts would be voidable under federal law. No one, including the SEC, says that Lehman Brothers cannot enforce the options contracts, as it has already done in liquidating them. Instead, the SEC is challenging Lehman Brothers' *security interest* in the proceeds created by the margin agreement and is arguing that that security interest, created by New York law, is also undermined by New York law because of Lehman Brothers' alleged bad faith.

If there were conflict between section 29(b) and New York law, the latter would give way under the Supremacy Clause. There is no such conflict. Section 29(b) is a federal law that makes the put option contracts unenforceable by the buyer against the seller where acquired through the buyer's violation of "this chapter" (presumably, Lehman Brothers was rescued by subsection (b)(2)).

The New York UCC provision relied on by the SEC does not contradict this outcome; it merely gives the SEC an independent ground under New York law for saying that Lehman Brothers has no valid security interest, a security interest that Lehman Brothers itself assumes it needs in order to prevail over the SEC.

■ Lehman Brothers' other resort is to section 29(c)(1), 15 U.S.C. § 78cc(c), which in pertinent part provides as follows:

> Nothing in this chapter shall be construed (1) to affect the validity . . . . of any lien . . . unless at the time of . . . the creating of such lien, the person . . . acquiring such lien shall have actual knowledge of facts by reason of which . . . the acquisition of such lien is a violation of the provisions of this chapter . . . . or (2) to afford a defense to . . . the enforcement of any lien by any person who shall have acquired such . . . lien in good faith for value and without actual knowledge of the violation of any provision of this chapter. . . .

The literal language of subsection (1) is no help to Lehman Brothers since it merely protects the lien (*i.e.*, the security interest) against any provision of the Securities Exchange Act that might otherwise be taken to invalidate it. Here, the SEC is relying upon provisions of the New York UCC—not "this chapter"—so the quoted language of section 29(c) does not by its terms apply.[7]

To be sure, in unusual circumstances a federal statute like section 29(c)(1) might be judicially expanded to protect the validity of the favored lien not just against the provisions of "this chapter" but against invalidation on any basis; literal language does not always prevail. *Cf. Church of Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). But it would require a

---

**6.** Actually, merely voidable at the behest of the defrauded seller. *See* 15 U.S.C. § 78cc(b); *SEC v. Levine*, 881 F.2d 1165, 1176 (2d Cir.1989).

**7.** One might argue that although the attempted invalidation is based directly upon New York law, "this chapter" is indirectly implicated because, as the SEC urges, it is Lehman's apparent suspicion that Pinez violated the Securities Ex-

change Act that constitutes Lehman's bad faith under New York law. We think it more likely that section 29(c) is addressed to claims of invalidity based on "this chapter" operating *ex proprio vigore* and not through indirect effect or adoption. As neither side has argued the point, our view is provisional.

remarkable showing to persuade a court to read out of the statute the explicit limiting phrase ("in this chapter"). No such argument has even been attempted by Lehman Brothers.

■ For a similar reason, we think that the district court read too broadly the subsection (2) of the same section 29(c), quoted above, which says that the Securities Exchange Act shall not be read to give a defense to enforcement of a lien where the lien holder acquired it "in good faith for value and without actual knowledge" of any violation of that statute. The district court took this provision to mean—apparently without support from the SEC—that "federal law governs Lehman's status as a bona fide purchaser in an action to enforce its lien." 989 F.Supp. at 343. Yet read literally, section 29(c)(2) is concerned only with the possible use of the federal statute, not New York law, to invalidate a lien.

Further, section 29(c)(2) does not by itself purport to invalidate any lien; it merely provides a *defense* to lien invalidation under certain circumstances. The possible reach of the defense is beside the point unless and until someone makes out a claim of invalidity, and the only effort to do so here—the SEC's claim of invalidity under New York law—has thus far fallen short. We leave for another day the interesting question whether the defense could ever operate where the attack on a lien was premised primarily upon state law and where state law invalidated a lien even of a good faith purchaser for value without actual knowledge of the securities-law violation.

Ordinarily, our reasoning would lead us to vacate the preliminary injunction at once. However, the put options have been reduced to a sum of money being held by Lehman Brothers in escrow, and there is no obvious harm to Lehman Brothers in maintaining the escrow in the short run. Possibly (the issue has not been argued) the SEC's ability to obtain "disgorgement" of these proceeds depends on the separate maintenance of this concrete stake, since there is no claim that Lehman Brothers itself violated the securities laws.

On remand, the district court can ascertain whether or not the SEC desires to pursue its disgorgement claim in light of our reading of New York law. If so, the district court can also decide whether the preliminary injunction is needed to avoid mooting the case; if there is such a need, and some prospect of success, the district court may choose to maintain the preliminary injunction, pending a prompt trial. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844–45 (D.C.Cir.1977).

Accordingly, the matter is *remanded* for further proceedings consistent with this opinion.