Moore v. Dartmouth College          CV-99-037-M    09/28/01

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Thurman Moore,
     Plaintiff

     v.                                    Civil No. 99-37-M
                                           Opinion No. 2001 DNH 180
Dartmouth College,
     Defendant


**O R D E R**


     Thurman Moore, proceeding pro se, brings this suit against

his former employer, Dartmouth College.  He says that when

Dartmouth was informed that his co-workers were subjecting him to

a racially hostile work environment, it failed to take effective

corrective action.  He seeks damages under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, et seq.  Dartmouth moves

for summary judgment, asserting that most of Moore's claims are

time barred and, more importantly, because it did take prompt and

appropriate remedial steps to address Moore's complaints, it did

not, as a matter of law, violate Title VII.  Moore objects and

has himself moved for summary judgment.

## Standard of Review

When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party. While a

2

reviewing court must take into account all appropriately documented facts, it may ignore bald assertions, unsupported conclusions, and mere speculation, see Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997), as well as those allegations "which have since been conclusively contradicted by [the non-moving party's] concessions or otherwise." Chongris v. Board of Appeals, 811 F.2d 36, 37 (1st Cir. 1987). And, while pleadings submitted by pro se litigants are "liberally construed," even pro se litigants must comply with the requirements of Rule 56. See Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 401 (1st Cir. 1988).

Here, only one of Moore's submissions even arguably constitutes an "affidavit" as contemplated by Rule 56(e). Liberally construed, his "Answer to the Affidavit of Ms. Linda Hathorn" (document no. 40) might meet the requirements of 28 U.S.C. § 1746, which allows for the submission of unsworn declarations, provided they are executed "under penalty of perjury." Although Moore's submission does not specifically

3

purport to be an unsworn declaration under penalty of perjury, he does represent that, "the foregoing statements are true to the best of my knowledge and belief." His memorandum in support of his objection to defendant's motion for summary judgment (document no. 39), however, is unsigned, and consists primarily of a lengthy chronology of the various forms of harassment to which he claims to have been subjected (involving events referenced in the complaint as well as previously undisclosed events) and a series of denials of many statements made in the affidavits submitted by Dartmouth. There are no references to documents, depositions, answers to interrogatories, or affidavits. His motion for summary judgment (document no. 52) suffers from the same shortcomings.

## Background

Moore initially worked as a temporary custodian for Dartmouth beginning in the fall of 1996. He was hired as a permanent employee on October 27, 1997, and continued his employment until June 5, 1998, when he resigned. He says he was

4

subjected to racial discrimination "almost from the start" of his tenure at Dartmouth. Although his complaint does not describe any of the alleged instances of harassment (nor does it specifically identify his claims as having been brought pursuant to Title VII), it does incorporate by reference the charge of discrimination he filed with the New Hampshire Commission for Human Rights ("NHCHR") and the Equal Employment Opportunity Commission ("EEOC"). In that charge, Moore identifies several instances of alleged workplace discrimination. First, shortly after he was hired in the fall of 1996, he says a co-worker named John told him he was hired to meet a quota. Charge of Discrimination (attached to complaint), at para. 2. Moore contends he discussed this event with his squad leader. There is, however, no written evidence of Moore's having told his supervisor of the event. Dartmouth asserts that the incident was unreported and, for that reason, it says no remedial action was taken.

In November 1997, Moore says he told a co-worker, Bruno, that he was looking for a temporary job at the post office over the holidays. He claims Bruno responded by saying Moore was interested in the position so he could steal checks and "send them to his people in Africa." Id. Moore reported the statement to his supervisor, Linda Hathorn. As a result, Bruno and Moore participated in a meeting with Hathorn, at which the event was discussed. Bruno was verbally reprimanded for his behavior and a statement to that effect was placed in his personnel file.

Moore was fired on December 12, 1997, for "not getting [along] with the squad." Id., at para. 5. He claims the reason offered by Dartmouth was a pretext and says he was actually fired because he had reported incidents of racial harassment to his supervisor the previous day. Id. See also Exhibit N to defendant's motion (document no. 36), Moore's response to interrogatory no. 13 ("I know I was terminated because of reporting racial remarks the day before I was fired."). Dartmouth, on the other hand, denies that Moore reported any

6

racial incidents on December 11 (there is no documentation of any such report) and, more generally, says Moore was not terminated for having reported any incidents of racial harassment. Instead, it says that Moore was discharged because he was a probationary employee, had a poor attendance record, and experienced problems working with other members of his team.

Following Moore's discharge, Dartmouth's Office of Equal Opportunity and Affirmative Action (the "OEO") conducted an independent internal investigation and recommended that Moore be rehired, concluding that discriminatory remarks had been made towards him, and his superiors had not provided him with "adequate feedback" regarding his questionable, possibly termination-worthy, performance and attendance record. Accordingly, Moore was reinstated with full back pay and no loss of seniority on January 12, 1998. After Moore returned to work, Dartmouth conducted several meetings to increase the sensitivity of Moore's fellow workers to racial issues in the workplace.

7

In the wake of those meetings, Moore claims his co-workers told him that he was the cause of the problems in the workplace, since he complained that discriminatory conduct had been directed at him. Id., at para. 7. Moore did not report the alleged co-worker response to the meetings as a specific or identifiable event, yet Dartmouth acknowledges that there was tension between Moore and his shop steward. Whether that animosity was racially based or, instead, simply the result of a personality conflict, is unclear. It is, however, apparent from the record that Dartmouth was unhappy with Moore's job performance, particularly between February and May, 1998. As before, Moore's problems related to his attendance record and poor working relationship with other employees. Three formal warnings were issued to Moore during that period.

In late January, a co-worker named Shirley allegedly told Moore to be careful and "watch his back," or someone would "shoot" him for causing too much trouble. Id., at para. 4. The parties dispute when Moore reported that event to Dartmouth. In

8

April 1998, Moore says another co-worker (Ray) told him that he believed Moore was receiving special treatment because of his race. Id. at para. 8. Moore reported the comment to members of the OEO, who convened a meeting between the parties, at which Ray acknowledged that his statement was inappropriate and apologized to Moore. Finally, on May 28, 1998, a note appeared on a door in Dartmouth's Hopkins Center that said, "Nigger quit you are not wanted here." Id., at para. 9. See also Exhibit H (attachment 3) to defendant's memorandum (a copy of the note). Moore says at that point he decided he could no longer endure the stressful work environment and, on June 5, 1998, he resigned. The OEO again investigated, interviewing seventeen staff members and temporary contract employees, but was unable to identify the author of the racially charged graffiti.

Dartmouth has had, and continues to maintain, an affirmative action/equal opportunity policy and office. Moore was well aware of Dartmouth's policy and, indeed, visited the office almost routinely. See, e.g., Exhibit H to defendant's memorandum,

Affidavit of Ozzie Harris, Director of Dartmouth's Office of Equal Opportunity and Affirmative Action (documenting 163 contacts with or regarding Moore between November 16, 1996, and June 17, 1998). Dartmouth says it responded promptly and effectively to all incidents of harassment and/or discrimination of which it was informed and, at the same time, worked diligently to manage a difficult employee with attendance, substance abuse, and co-worker relationship problems.

Moore filed a charge of discrimination with the NHCHR on September 29, 1998. Notice of the charge was received by the EEOC on October 9, 1998, which subsequently determined that it lacked sufficient time and resources to fully investigate Moore's complaint. Accordingly, the EEOC issued Moore a right to sue letter on January 11, 1999. Moore filed his complaint in this court on January 26, 1999.

## Discussion

I. <u>Timely Filing</u>.

Title VII requires a plaintiff to file charges of discrimination with the EEOC within 180 days of the discriminatory act. <u>See</u> 42 U.S.C. § 2000e-5(e)(1). Importantly, however, that requirement is not considered jurisdictional and, like a statute of limitations, is "subject to waiver, estoppel, and equitable tolling." <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 393 (1982). <u>See also</u> <u>Rice v. New England College</u>, 676 F.2d 9, 10 (1st Cir. 1982).

Moreover, the EEOC 180 day filing requirement may be extended to 300 days if the charge of discrimination is filed with an authorized state agency in a deferral jurisdiction. <u>See</u> 42 U.S.C. § 2000e-5(e). <u>See also</u> <u>Landrau-Romero v. Banco Popular de Puerto Rico</u>, 212 F.3d 607, 611 (1st Cir. 2000). New Hampshire is a deferral jurisdiction, and filing with its agency, the NHCHR, generally increases the filing period to 300 days. <u>See</u> <u>Madison v. St. Joseph Hosp.</u>, 949 F. Supp. 953, 957-58 (D.N.H.

11

1996). Whether an extension to 300 days is available, however, depends upon the provisions of state law and the terms of an annual Worksharing Agreement between the EEOC and the state agency. See Kleine v. Connell Communications, Inc., 955 F. Supp. 154, 156 (D.N.H. 1996). In this case, however, the provisions of the Worksharing Agreement are not at issue, since NHCHR's jurisdiction does not extend to educational or non-profit organizations, like Dartmouth. See N.H. Rev. Stat. Ann. § 354-A:2 VII. Consequently, the administrative filing deadline in this case was limited to 180 days. See 29 C.F.R. § 1601.13(a)(2) ("A jurisdiction having an FEP agency without subject matter jurisdiction over a charge . . . is equivalent to a jurisdiction having no FEP agency."). So, to be actionable under Title VII, a discriminatory act directed against Moore must have taken place on or after April 2, 1998. Three events - the asserted remark from co-worker Ray ("you're receiving special treatment"), the highly offensive graffiti, and Moore's resignation - all occurred after April 2, 1998.

II.  Continuing Violation.

Moore contends he was harassed "almost from the start" of his employment at Dartmouth, thereby (implicitly, at least) making a claim of continuing violation.  See generally O'Rourke v. City of Providence, 235 F.3d 713, 730-33 (1st Cir. 2001) (discussing in detail the concept of serial violations and the continuing violation doctrine).  Dartmouth disagrees.

The continuing violation doctrine allows for the consideration of otherwise time-barred events if they are shown to have been part of an ongoing series of discriminatory acts and at least one violation within the limitations period "anchors the earlier claims."  Id., at 730 (citing Provencher v. CVS Pharmacy, Div. of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998)).  Even giving Moore the benefit of the doubt, however, and assuming that he is entitled to invoke the continuing violation doctrine to revive his otherwise time-barred claims, the record establishes that Dartmouth is, for the reasons discussed below, entitled to judgment as a matter of law.

13

III. Hostile Work Environment.

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Hostile work environment, though not specifically referenced in the text of Title VII, describes one form of discrimination that is actionable under the statute. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998). An abusive or hostile work environment is created when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citation omitted). Consequently, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not violate Title VII. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citation omitted). In other words, Title

14

VII is intended to protect employees from severe and/or pervasive discrimination in the workplace; it does not operate as a "general civility code" for the American worker. See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998).

The hostile work environment theory is equally applicable to sexual and racial harassment claims. See Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996) ("Harassment based on membership in a protected class is one form of employment discrimination."). See also Meritor, 477 U.S. at 66. To prevail on such a claim, a plaintiff must establish each of the following essential elements:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome [racial] harassment; (3) that the harassment was based upon [race]; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment; (5) that [racially] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

15

O'Rourke, 235 F.3d at 728 (presenting the test with reference to sexual harassment) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-89 (1998)).

Moore, an African American, is a member of a protected class and, therefore, the first element is plainly met. And, while some of the incidents he recounts fail to rise to the level of actionable, racially motivated harassment, the graffiti incident certainly constitutes race-based harassment (assuming, of course, that the graffiti was authored by a Dartmouth employee or someone over whom Dartmouth exercised control). Accordingly, the second and third elements are also met. And, giving Moore the benefit of the doubt, the court will assume that his allegations are sufficient (if credited as true) to warrant the conclusion that he has established each of the remaining factual elements of a prima facie claim under Title VII (or, at a minimum, shown that there is a genuine dispute as to one or more elements).

IV.  Employer Liability for Co-Worker Harassment.

An employer violates Title VII and engages in unlawful discrimination when its conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Meritor Savings Bank v. Vinson, 477 U.S. at 65 (citation omitted).  Hostile work environment cases fall into two categories: those in which the plaintiff is harassed by a supervisor and those in which he or she is harassed by a co-worker.  Perhaps not surprisingly, the standards for employer liability are quite different depending on whether the plaintiff's alleged harasser held a supervisory position.  See, e.g., O'Rourke, 235 F.3d at 736-37; White, 221 F.3d at 261.

This case presents a situation in which the plaintiff seeks to hold his former employer liable for alleged harassment at the hands of non-supervisory co-workers.  The Court of Appeals for the Sixth Circuit has provided a clear and thoughtful discussion

17

of the basis for imposing liability on an employer under those circumstances.

> [T]he employer's liability in cases of co-worker harassment is direct, not derivative; the employer is being held directly responsible for its own acts or omissions. Thus, <u>when an employer responds to charges of co-worker [racial] harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known</u>. The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment.

<u>Blankenship v. Parke Care Centers, Inc.</u>, 123 F.3d 868, 873 (6th Cir. 1997) (emphasis supplied). <u>See also</u> <u>Tutman v. WBBM-TV, Inc.</u>, 209 F.3d 1044, 1048 (7th Cir. 2000) ("[A]n employer is not strictly liable under Title VII for [racial] harassment perpetrated by its employees."), <u>cert.</u> <u>denied</u>, 531 U.S. 1078 (2001).

Notwithstanding his lack of formal legal training, Moore certainly appears to understand that his claim against Dartmouth is based upon its alleged failure to address his hostile work

18

environment; he does not seek to impose indirect liability on Dartmouth merely because his co-workers subjected him to an arguably hostile workplace.  <u>See</u> Plaintiff's pretrial statement (document no. 48) ("Plaintiff does not allege that Dartmouth itself engaged in discriminatory conduct against him nor that it is liable on an agency or respondeat superior basis.").

As the court of appeals for this circuit has observed, "[i]f the harassment is caused by a co-employee, the employer is liable it if 'knew or should have known of the charged [racial] harassment and failed to implement prompt and appropriate corrective action.'"  <u>White v. New Hampshire Dept. of Corrections</u>, 221 F.3d 254, 261 (1st Cir. 2000) (quoting <u>Blankenship</u>, 123 F.3d at 872).  The <u>Blankenship</u> court discussed in some detail the obligations imposed on employers by Title VII and concluded:

> Once an employer is aware of and responds to charges of [racial] harassment, . . . <u>mere negligence as to the content of the response cannot be enough to make the employer liable</u>.  When an employer responds with good-faith remedial action, we cannot say that the employer

19

has itself committed an act of discrimination. In sum, although negligence as to the <u>existence</u> of harassment may be enough, . . . for an employer to incur liability for discrimination, negligence in the fashioning of a remedy is not. When an employer implements a remedy, it can be liable for [racial] discrimination in violation of Title VII <u>only if that remedy exhibits such indifference</u> as to indicate an attitude of permissiveness that amounts to discrimination.

<u>Blankenship</u>, 123 F.3d at 873 (citations omitted) (emphasis supplied).

Like so many other courts that have addressed this issue, the court of appeals for this circuit has held that the standard by which an employer's conduct is measured is one of "reasonableness."

We agree with defendants that an employer who has taken reasonable steps under the circumstances to correct and/or prevent racial harassment by its nonsupervisory personnel has not violated Title VII. . . . It may not always be within an employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy. To what lengths an employer must go we do not venture to say. The seriousness of the harm posed by the conduct will be a factor. But once

20

> an employer has in good faith taken those measures
> which are both feasible and reasonable under the
> circumstances to combat the offensive conduct we do not
> think he can be charged with discriminating on the
> basis of race.

DeGrace v. Rumsfeld, 614 F.2d 796, 805 (1st Cir. 1980).  See also

Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 676 (10th Cir.

1998) ("[W]e adopt the test employed by some of our sister

circuits, asking whether the remedial and preventative action was

'reasonably calculated to end the harassment.'").  Several

factors are relevant when considering the "reasonableness" of an

employer's response to reports of racial discrimination and/or

harassment in the workplace.  They include: (1) whether the

employer was successful in stopping such conduct; (2) the

timeliness of the plaintiff's complaint(s); (3) the promptness of

the employer's response; and (4) whether that response was

proportional to the seriousness and frequency of the harassment.

See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55, 65 (2d

Cir. 1998); Adler, 114 F.3d at 676.

21

V.   Dartmouth's Responses to Moore's Complaints.

As noted above, Dartmouth has submitted documentation evidencing over 150 contacts by its Office of Equal Opportunity and Affirmative Action, either directly with or involving Moore. Each time Dartmouth was informed of unacceptable conduct having been directed at Moore, it took prompt steps to remedy the situation, escalating the nature of its response with each successive incident. According to Dartmouth's Director of Equal Opportunity and Affirmative Action, "In no instance did a complaint of Mr. Moore's fail to receive a response, and in no instance did Mr. Moore complain to me that an employee repeated offensive behavior after being warned about such behavior by a College official." Exhibit H to defendant's memorandum, affidavit of Ozzie Harris at para. 13.

With regard to the first incident identified in Moore's complaint (co-worker Bruno's statement about stealing checks), Moore reported the statement to his supervisor, Linda Hathorn. According to Hathorn, she spoke with Earl Sweet, president of the

22

union that represents custodial, maintenance, and food service workers at Dartmouth, who urged her to issue a written warning to Bruno. See Exhibit F to defendant's memorandum, Affidavit of Linda Hathorn at para. 4. Hathorn then met with Bruno, Moore, and Tim Beebe (Moore's counselor at the Veterans' Administration Hospital in White River Junction, Vermont). According to Hathorn, Bruno acknowledged making the statement and admitted it was wrong. Hathorn then said she was inclined to issue Bruno a written warning, but Moore urged her not to do so. Id. See also Moore's objection (document no. 39) at 4 ("At the meeting, I did say I did not want [Bruno] to get fired for making these comments, just to talk with him."). Accordingly, Hathorn issued Bruno a verbal warning, documentation of which is attached to her affidavit.

With regard to the second incident identified in Moore's complaint (co-worker statement that he was hired to meet a quota), Dartmouth says Moore never reported that event. It does, however, acknowledge that during his initial six-month

23

probationary period, Moore periodically complained to Hathorn about unspecified incidents of co-workers being "unfair" and "lying." Several of Moore's reports were made when he telephoned Hathorn and other supervisors at home on nights and weekends. Moore was specifically instructed to: (1) deal with such issues during work hours; and (2) provide details about any offensive behavior directed at him, so that Dartmouth might formulate an appropriate response. See Exhibit F (attachment 3) to defendant's memorandum.

With regard to the comments from Moore's co-worker Shirley ("watch your back"), Dartmouth says Moore did report that the comments were made, but refused to provide sufficient details to permit any sort of investigation. Nevertheless, through a series of meetings, Dartmouth attempted to develop a better working relationship between Moore and his co-workers, some of whom said they found Moore to be "intimidating and volatile" and that they avoided him out of concern they might "set him off." According to Hathorn, Moore participated in some of those meetings and

24

expressed satisfaction with the steps Dartmouth had taken to address his concerns. <u>See</u> Exhibit F to defendant's memorandum, Hathorn affidavit at para. 8.

With regard to Moore's claim that co-workers blamed him for causing problems in the workplace, Dartmouth says it was never informed of that specific event (or events). Nevertheless, it recognized that Moore was having difficulty working with other employees and, therefore, convened several meetings with the custodial staff (in consultation with the Office Equal Opportunity and Affirmative Action) to discuss issues of diversity, racial tolerance, and the importance of working together as a team.

Subsequently, Moore told Ozzie Harris, the head of the OEO, that a co-worker remarked that Moore was receiving special treatment because he is black. Harris met with both Moore and the co-worker, Ray Landry. Landry acknowledged making the remark and apologized to Moore. According to both Harris and Hathorn,

25

Moore and Landry remained on friendly terms after Landry apologized and Moore never again complained of any problems with him.

Finally, after Moore reported his discovery of the offensive graffiti, Dartmouth immediately began an investigation. Michael Getter, Director of Facilities Operation and Maintenance (Moore's department head), met with Moore and various supervisors to try to determine who might have posted the note. Additionally, the OEO began its own investigation, during which it interviewed nearly twenty college employees and temporary contract workers. Despite its investigative efforts, Dartmouth was unable to determine who had left the note. Moore was given paid leave after the incident and encouraged to provide Dartmouth with any relevant information he might have concerning who might have left the note. When Moore indicated that he intended to resign, representatives of the OEO again met with him and counseled him against doing so. They told him that in light of his medical problems (he said he would be enrolling in a residential alcohol

26

treatment program at the VA Hospital), he could go on short-term disability, thereby preserving the option to return to his position when he finished his treatment, and decide at that time whether he still wished to resign.  Moore elected not to follow that advice and submitted his resignation.

In summary, on each occasion that Dartmouth became aware that Moore had been subjected to offensive or potentially offensive comments by co-workers, it investigated the matter and took prompt remedial action, escalating the nature of its response with each subsequent incident.  That involved, among other things, formally reprimanding two employees about their conduct, warning them to immediately discontinue such behavior, and making appropriate notations in their personnel files; conducting several meetings with Moore's co-workers to sensitize them to issues of race in the workplace; meeting frequently with Moore, listening to his complaints, soliciting his ideas on ways to resolve his concerns about his relationship with co-workers, and offering various forms of support (including paid leave, the

27

option to elect short-term disability leave, etc.); and conducting an extensive investigation into the graffiti incident.

Reasonable minds might honestly debate the efficacy of Dartmouth's various responses and/or the availability of other potential remedies that it might have pursued. But, Dartmouth is not strictly liable for harassment perpetrated by its employees on fellow employees. It can be held liable under Title VII only if its responses "indicate an attitude of permissiveness that amounts to discrimination," Blankenship, 123 F.3d at 873, or, at a minimum, if it failed to acted "reasonably" under the circumstances. See, e.g., DeGrace, 614 F.2d at 805 (imposing on employers the obligation to take "reasonable steps under the circumstances to correct and/or prevent racial harassment"). Although Dartmouth was not able to completely rid the workplace of unpleasant comments and/or harassment directed toward Moore, it certainly responded promptly and in a manner reasonably calculated to address each of his specific complaints (through counseling and formal disciplinary action) and designed to

28

prevent any risk of systemic harassment (by addressing and

counseling Moore's co-workers in group meetings). As the Court

of Appeals for the Tenth Circuit has observed:

> A stoppage of harassment shows effectiveness, which in
> turn evidences such reasonable calculation. However,
> this is not the sole factor to be considered. Because
> there is no strict liability and an employer must only
> respond reasonably, a response may be so calculated
> even though the perpetrator might persist.
>
> * * *
>
> [A]n employer is not liable, although a perpetrator
> persists, so long as each response was reasonable. It
> follows that an employer is not required to terminate a
> perpetrator except where termination is the only
> response that would be reasonably calculated to end the
> harassment. Unfortunately, some harassers may simply
> never change. Just as unfortunate, a victim may have
> to suffer repeated harassment while an employer
> progressively disciplines the perpetrator to determine
> whether he or she is just such a "hard head" case.

Adler, 144 F.3d at 676. See also Landgraf v. USI Film Products,

968 F.2d 427, 430 (5th Cir. 1992) ("Title VII does not require

that an employer use the most serious sanction available to

punish an offender, particularly where, as here, this was the

first documented offense by an individual employee.").

29

Under the circumstances presented in this case (particularly since the majority of harassment constituted racially-oriented comments from separate perpetrators, each of whom stopped after being disciplined or counseled by the employer), no rational trier of fact could justifiably conclude that Dartmouth's conduct was not reasonably calculated to bring a prompt end to the hostility to which Moore was subjected. "Once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with discriminating on the basis of race." DeGrace, 614 F.2d at 805.

Dartmouth's conduct certainly does not indicate an "attitude of permissiveness" toward racial harassment sufficient to warrant the conclusion that it discriminated against Moore. To the contrary, the record reveals that Dartmouth acted promptly, reasonably, and in a good faith effort to end any harassment or even potential harassment to which Moore was or might have been subjected. That is precisely what Title VII demands. While

30

Dartmouth's "remedial efforts did not meet [Moore's] expectations, they were both timely and reasonably likely to prevent the conduct underlying [his] complaint from recurring." Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 535 (7th Cir. 1993). Dartmouth is, therefore, entitled to judgment as a matter of law with regard to Moore's Title VII hostile work environment claim.

VI. Title VII and Constructive Discharge.

Because Moore's complaint is somewhat vague, it is unclear whether he also seeks damages under Title VII for constructive discharge. Assuming he is advancing such a claim, the record reveals that Dartmouth is entitled to judgment as a matter of law.

The Court of Appeals for the First Circuit has held that a plaintiff alleging discriminatory constructive discharge under Title VII must establish:

31

that he (1) was within a protected class; (2) met the employer's legitimate performance expectations; (3) was actually or constructively discharged; and (4) was replaced by another with similar skill and qualifications. Alleging constructive discharge presents a "special wrinkle" that amounts to an additional prima facie element. In such cases, the plaintiff must prove that his employer imposed working conditions so intolerable that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities.

Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 612-13 (1st Cir. 2000) (citations and internal quotation marks omitted) (emphasis supplied). For the reasons discussed above, Dartmouth did not, as a matter of law, "impose" on Moore working conditions so intolerable that a reasonable person would feel compelled to resign. While Moore's co-workers may have subjected him to racially charged comments, and while it is possible that one of them was responsible for the offensive graffiti, Dartmouth undertook prompt and reasonable action to alleviate such harassment. Consequently, Moore's constructive discharge claim necessarily fails.

32

In other words, because Dartmouth responded appropriately to Moore's complaints of workplace harassment (and, for that reason, cannot be said to have discriminated against him), it cannot have "imposed" on him a hostile work environment.  Moreover, as many courts have recognized, if a plaintiff cannot, as a matter of law, prevail on his or her hostile work environment claim, he or she necessarily cannot prevail as to a Title VII constructive discharge claim.  See Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 48 (1st Cir. 1998) (citing cases).  See also Landgraf, 968 F.2d at 430 ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.").

**Conclusion**

As the Supreme Court has observed, Title VII is not a code of civility for the workplace.  Oncale, 523 U.S. at 81.  Nor does it impose on employers the obligation to insure an antiseptic working environment in which employees are guaranteed the right

33

to be free from insult, ridicule, or even discrimination by co-workers.  Instead, Title VII imposes on employers who are (or should be) aware of co-worker harassment in the workplace the obligation to take prompt and reasonable measures designed to end the offensive conduct.

Here, in response to Moore's complaints of racial harassment, Dartmouth undertook prompt and reasonable corrective action designed to end such harassment.  Consequently, no reasonable factfinder could conclude that Dartmouth's conduct constituted an inadequate response to Moore's complaints or that it discriminated against Moore in violation of Title VII.  Dartmouth is, therefore, entitled to judgment as a matter of law and its motion for summary judgment (document no. 36) is granted.  Moore's motion for summary judgment (document no. 52) is denied.  Dartmouth's motion to strike (document no. 44) is denied as moot.  The Clerk of the Court shall enter judgment in favor of defendant and close the case.

34

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 28, 2001

cc:  Thurman Moore, pro se
     Sean M. Gorman, Esq.