■ MCC PROCEEDS, INC., Respondent-Appellant, v ADVEST, INC., Appellant-Respondent. [743 NYS2d 1] —Judgment, Supreme Court, New York County (Harold Tompkins, J.), entered July 6, 2001, after a nonjury trial, in favor of plaintiff and against defendant in the principal amount of $3,704,441.08, plus interest, costs and disbursements, bringing up for review an order, same court (Edward Greenfield, J.), entered on or about July 28, 1997, which, inter alia, denied defendant's motion for summary judgment dismissing the complaint, and an order, same court (Harold Tompkins, J.), entered June 18, 2001, directing entry of judgment for plaintiff in the aforestated amount, but denying plaintiff's request for damages in the principal amount of $5,850,228.13, unanimously affirmed, with costs. Appeal from the June 18, 2001 order unanimously dismissed, without costs, as subsumed in the appeal from the ensuing judgment.

This appeal arises out of a scheme by the now-deceased media tycoon Robert Maxwell (Maxwell) and several of his associates in November 1990 to use Maxwell's control over

publicly traded Macmillan, Inc. (Macmillan) to transfer 10.6 million shares of publicly traded Berlitz International, Inc. (Berlitz), representing 55.6% of the outstanding shares, improperly from Macmillan to a privately controlled entity, Bishopsgate Investment Trust, plc (BIT), and then use those shares as collateral to obtain loans from various financial institutions to shore up Maxwell's private companies.

In August 1990, Sheldon Aboff (Aboff), an associate of Maxwell, opened a cash and margin account at defendant Advest, Inc. (Advest), a licensed securities broker-dealer. Based on information given by Aboff over the telephone, Anthony Polyviou, a licensed broker at Advest, filled out a new account application card, listing Aboff as the vice-chairman of the Thomas Cook International travel agency, with a net worth of $1 million, annual income of $500,000, and a liquid net worth of $100,000. That information was updated in July 1991 to reflect a net worth of $5 million, annual income of $1 million and liquid net worth of $100,000. From July 1990 to October 1991, Advest, on behalf of Aboff, effected transactions ranging up to $1.1 million, and the value of his portfolio grew to $1.7 million, subject to a margin debt of $800,000.

On or before November 1, 1991, Aboff asked Polyviou if Advest would lend him $1.5 million against 200,000 shares of Berlitz, worth about $3.5 million. Polyviou asked whether Aboff was an insider or if the shares were restricted or encumbered, to which Aboff responded in the negative, and Gary Rafaloff (Rafaloff), Polyviou's branch manager, approved the loan. On November 1, 1991, 200,000 shares of Berlitz were transferred from BIT to Aboff's Advest account via the Depository Trust Company (DTC), a "clearing corporation" within the meaning of UCC 8-102 (3); that same day, Advest extended Aboff a $1.5 million loan and, pursuant to his instructions, immediately wired the proceeds to PH(US), Inc., a company privately controlled by Maxwell.

Polyviou conceded that he was "surprised" by such a large and highly concentrated transfer (for Aboff) and obtained a report from Standard & Poor's, which indicated that Macmillan, a subsidiary of Maxwell Communications Corp., owned 56% of the 19 million outstanding shares.

Shortly thereafter, Aboff sought a similar loan, Polyviou again asked whether Aboff was an insider or the shares were restricted or encumbered, and on November 12, 1991, an additional 200,000 shares of Berlitz were transferred via the DTC to Aboff's Advest account, against which Advest loaned Aboff $1.7 million and wired the proceeds to PH(US), Inc. A

similar inquiry with the same negative response took place around November 29, 1991, and on December 3, 1991, 600,000 shares of Berlitz were transferred through the DTC to Aboff's Advest account. Since those shares were subject to a $1 million margin debt to Prudential Bache, the clearing broker for the transferor, Advest paid the amount and debited Aboff's Advest account accordingly.

Thus, over the course of one month, 1 million shares of Berlitz, representing 5.3% of total Berlitz shares, 11.9% of those not held by Macmillan, and worth about $16 million, more than three times Aboff's net worth, were transferred to Aboff's account at Advest, which loaned him $4.2 million, of which $3.2 million was immediately wired to a Maxwell-controlled private entity.

On December 11, 1991, Advest received a fax from Macmillan's counsel claiming that the shares had been improperly transferred to BIT, and that Macmillan remained the beneficial owner. The next day, Advest demanded that Aboff repay his margin debt, and when Aboff was unable to comply, Advest liquidated his entire non-Berlitz securities plus 235,000 shares of Berlitz, to satisfy that debt. Subsequently, the remaining 765,000 shares or the proceeds thereof were surrendered to plaintiff herein MCC Proceeds, Inc. (MCC), as successor to Macmillan, pursuant to the parties' stipulation. Thereafter, MCC's claim of conversion against Advest, and Advest's affirmative defense of bona fide purchaser, were addressed on summary judgment and at trial.

Pursuant to UCC 8-302 (1) in effect during the relevant period,* a bona fide purchaser is "a purchaser for value in good faith and without notice of any adverse claim," who thereby "in addition to acquiring the rights of a purchaser * * * also acquires his interest in the security free of any adverse claim" (UCC 8-302 [3]). It is undisputed that Advest was a purchaser for value, and that it had no actual notice of claim. However, contrary to the determinations of the motion and trial courts, the "good faith" of defendant, in its capacity as a securities broker-dealer purchasing from (or lending to) a customer and therefore subject to UCC 8-302, was not properly measured against compliance with reasonable commercial standards, which requirement was imposed only on brokers acting as mere agents or bailees (or conduits) for the customer, by operation of former UCC 8-318.

---

* The 1997 revisions to UCC article 8 do not apply to actions, such as this one, which were commenced before the revisions took effect. All references in this decision to UCC article 8 are to the code sections in effect in 1991, before the 1997 revisions.

To the extent *Hartford Acc. & Indem. Co. v Walston & Co.* (21 NY2d 219 [*Walston I*]) might be interpreted in favor of the contrary position, the Court of Appeals expressly stated on reargument that its holding was limited to certain provisions of the former Personal Property Law, not applicable here, and thus that "good faith" was not an issue and was not necessary to reach (*see, Hartford Acc. & Indem. Co. v Walston & Co.*, 22 NY2d 672, 673 [*Walston II*]). Furthermore, the case involved only a "selling broker" or agent; the case was governed by the then-applicable Negotiable Instruments Law and Stock Transfer Act, not the UCC; no mention was made of UCC 8-302 (bona fide purchaser) or UCC 1-201 (19) (good faith definition); and *Walston I* merely referenced UCC 8-318, which by its plain terms applied only to brokers acting as agent or bailee. Rather, "good faith," as encompassed in UCC 8-302, is defined by UCC 1-201 (19) as "honesty in fact," which involves a subjective test (*see, Chemical Bank of Rochester v Haskell*, 51 NY2d 85, 91), not the objective "reasonable commercial standards" test, found only in UCC 8-318, which again applied only to agents or bailees.

The remaining element pertinent to the determination of bona fide purchaser status is "notice," which is established if the purchaser has actual knowledge of an adverse claim, a circumstance not claimed in this matter, or has "knowledge of such facts that his action in taking the security amounts to bad faith" (UCC 8-304 [4]). That second alternative basis is a subjective test, requiring actual knowledge of "facts indicating bad faith in taking the instrument" and is not subject to "speculation as to what [the purchaser] had reason to know, or what would have aroused the suspicion of a reasonable person in [the purchaser's] circumstances" (*see, Hartford Acc. & Indem. Co. v American Express Co.*, 74 NY2d 153, 162-163). Thus, that second notice prong is not materially different from the "good faith" standard, and under both, "bad faith is not mere carelessness," but rather requires "guilty knowledge or willful ignorance," and it is not enough that the circumstances "might possibly excite the suspicions of wary vigilance" (*see, Manufacturers & Traders Trust Co. v Sapowitch*, 296 NY 226, 229, 230).

Nevertheless, "actual knowledge of some fact which would prevent a commercially honest individual from taking up the [securities]" would establish bad faith (*see, Chemical Bank of Rochester*, 51 NY2d, *supra* at 92). If the circumstances known to the purchaser are so obviously suspicious that no honest person (not just a reasonably prudent person) could turn a

blind eye thereto, the purchaser must investigate. Thus, there is a threshold objective inquiry, although the emphasis remains on subjective bad faith and dishonesty (*see, Securities & Exch. Commn. v Lehman Bros., Inc.*, 157 F3d 2, 6-7), and will be met in only the most rare and egregious circumstances.

The instant matter presents such a case. It is undisputed that Polyviou, acting on behalf of Advest, knew that over the course of one month Aboff transferred into his account 1 million shares of Berlitz (indirectly controlled by a public company dominated by Maxwell), comprising 5.3% of Berlitz's total shares and worth $16 million, against which Aboff borrowed and immediately transferred $3.2 million to a company privately controlled by Maxwell. Not only did Polyviou realize that this was an uncharacteristically large transfer and uncharacteristically large loan for Aboff, but also that Aboff suddenly obtained shares worth more than three times his net worth and 160 times his liquid net worth. Moreover, Polyviou conceded his subjective "surprise" at the transactions, although he denied he was "suspicious." Viewing these circumstances in the totality, we find that the facts actually known to Polyviou were so egregiously suspicious that his lack of investigation amounted to bad faith. The fact that the Berlitz shares were transferred to Advest via the DTC, a securities depository, does not alter that result, particularly since Polyviou admitted having no idea whether that system vouched for any ownership of shares.

We have considered Advest's other arguments, including equitable estoppel and collateral estoppel, and MCC's argument concerning a control premium measure of damages, and find them unavailing. Concur—Tom, J.P., Buckley, Sullivan, Ellerin and Wallach, JJ.